870 So.2d 968 (2004)
Brian CAMPBELL, et al.
v.
TORK, INC., et al.
No. 2003-CC-1341.
Supreme Court of Louisiana.
February 20, 2004.
Rehearing Denied May 14, 2004.
*969 Peuler & Ernst, Gregory L. Ernst, New Orleans, Anthony D'Alto, II; Windhorst, Gaudry, Ranson, Higgins & Gremillion, Gretna, William H. Voigt, New Orleans, for applicant.
Falcon Law Firm, Timothy J. Falcon, Deani Beard Milano, Marrero; The Diddel Law Firm, A. Glenn Diddel, III, Houston, TX; Shapiro & Shapiro, Kristina Webb Shapiro, Baton Rouge, for respondent.
Prior report: 855 So.2d 290.
VICTORY, J.
At issue in this case is whether the trial court abused its discretion in granting the plaintiff's motion for a new trial. After reviewing the trial record and applicable law, we find that the trial court erred in granting a new trial and therefore reverse that ruling and reinstate the verdict rendered by the jury.

FACTS AND PROCEDURAL HISTORY
Brian Campbell[1] ("Campbell") filed suit against Tork, Inc. for injuries arising from an accident that occurred on February 22, 1995 while Campbell was employed as a finance and insurance manager at Benson BMW/ Isuzu/ Volkswagen, Inc. The accident happened when Campbell arrived at work, attempted to turn off the outside lights by flipping a switch on the timer box, and received a brief electrical shock. Eyewitness evidence suggests that as a result of this shock, Campbell fell against a doorframe, though it is unclear as to whether he lost consciousness.[2] Later that day, after complaining of shortness of breath and dizziness, he was sent to Dr. Marc Acosta, whose practice included treating work-related injuries from the Benson dealerships. The next day, Campbell returned to the job, but was fired a month later for falsifying reports unrelated to the accident. Campbell filed suit in 1996 alleging the electrical shock caused brain damage resulting in escalating *970 cognitive problems, and thus impairing his ability to function normally.
After a six-day trial beginning March 4, 2002, the jury returned a verdict in favor of Campbell for $50,000, which included $25,000 general damages for past physical and mental pain, suffering, and anxiety and $25,000 special damages for past lost wages and employee benefits, but awarded no medical expenses. Campbell then filed alternative motions for a JNOV, Additur, or New Trial. After taking the motions under advisement, on October 31, 2002, the trial judge granted a new trial without issuing reasons.[3]
Following a writ denial by the Fifth Circuit Court of Appeal, we granted the defendants' writ to determine whether the trial judge abused his discretion in granting the plaintiff's motion for a new trial.

DISCUSSION
La. C.C.P. art.1972 provides:
A new trial shall be granted, upon contradictory motion of any party, in the following cases:
(1) When the verdict or judgment appears clearly contrary to the law and the evidence.
(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.
Additionally, La. C.C.P. art.1973 provides:
A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law.
As previously indicated, the trial court did not give any reasons for granting a new trial. However, we note that the plaintiff asked for relief under La. C.C.P. arts.1972(1) and 1973. Since the trial judge included no "good ground" for granting a new trial under La. C.C.P. art 1973 in his judgment, and none appears in the record, we conclude that he found the verdict "contrary to the law and the evidence" as stated in La. C.C.P. art.1972(1). Thus, we will examine the trial court's ruling in accordance with the standard for granting or denying a motion for new trial under this provision.
A trial judge may order a new trial if a jury's verdict cannot be supported by "any fair interpretation of the evidence" Martin v. Heritage Manor South Nursing Home XXXX-XXXX (La.4/3/01), 784 So.2d 627, 631-632. As explained in Davis v. Wal-Mart Stores, Inc., 00-0445 (La.11/28/00), 774 So.2d 84:
The fact that a determination on a motion for new trial involves judicial discretion... does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. Thus the jury's verdict should not be set aside if it is supportable by any fair interpretation *971 of the evidence [emphasis added]. Davis, supra, 774 So.2d. at 93 (citing Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2 Cir. 1991)).[4]
In considering whether to grant a motion for a new trial, "the trial court may evaluate the evidence without favoring either party, it may draw its own inferences and conclusions; and evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable witness." Joseph v. Broussard Rice Mill, Inc. 00-0638 (La.10/30/00), 772 So.2d 94 (citing Smith v. American Indem. Ins. Co., 598 So.2d 486 (La.App. 2d. Cir.)), writ denied, 600 So.2d 685 (La. 1992).
The applicable standard of review in ruling on a motion for new trial is whether the trial court abused its discretion.[5]Martin, supra at 632. In order to apply this standard, "we are faced with the balancing of two very important concepts: the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial." Davis, supra 774 So.2d. at 93-94. Though the "[trial] court has much discretion [in determining whether to grant a new trial], this Court will not hesitate to set aside the ruling of the trial judge in a case of manifest abuse." Lamb v. Lamb 430 So.2d 51 (1983). Thus, although "the scales are clearly tilted in favor of the survival of the jury's verdict, the trial court is left with a breadth of discretion which varies with the facts and events of each case." Davis, supra 774 So.2d. at 94.
Although our standard of review is relatively straight-forward, the application of this standard is more complicated. Martin, supra at 632. In order to enable this Court to correctly apply this standard of review, the facts and evidence presented in each case are very important. The trial record must be examined carefully to determine if the trial court abused its discretion in deciding that the jury verdict was not supportable by "any fair interpretation of the evidence." Thus, the evidence and testimony is hereafter examined in order to correctly apply our standard of review.
Prior to the trial, the plaintiff and defendants stipulated as to the defendants' liability for the shock Campbell received while employed at the dealership. Due to this stipulation, the trial concerned only damages, and the primary issues that were presented to the jury involved the causal *972 connection between the plaintiff's claimed brain injury and the accident, and the severity of any related injury. The witnesses included those who testified as to what occurred on the day of the accident, including plaintiff's mental and physical state subsequent to the accident, as well an expert witness who testified as to the effect such a shock would have on person. Of primary importance, however, is the testimony of the treating and examining physicians who had examined Campbell and rendered various diagnoses as to his injuries. After an independent review of the record, we find the testimony of many of these witnesses provides substantial evidence to support the jury verdict, and thus "is supportable by any fair interpretation of the evidence." Davis, supra 774 So.2d. at 93 (citing Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2 Cir.1991)).
Immediately after the accident, the plaintiff was sent to Dr. Acosta, a board certified internist, who found no signs of trauma nor burns from electrical shock. According to the medical records from this examination, the plaintiff complained only of dizziness, shortness of breath and trembling. After running an EKG, and finding it to be normal, Dr. Acosta discharged him to return to work the following day.
From March of 1995 until May of 1995, Campbell sought treatment from Dr. Maria Palmer, a neurologist, upon referral of his attorney. Dr. Palmer found no evidence of trauma, and found normal neurological patterns in Campbell. She did, however, diagnose a mild cervical muscle spasm in his neck, and a mild concussion for which plaintiff was prescribed pain medication.
From April until August of 1995, Campbell saw Dr. Michael Ballard, an internist, complaining of headaches. Dr. Ballard found no evidence of a burn or electrical shock and did not diagnose any neurological deficits in the plaintiff. He did conclude that plaintiff had a cervical muscle spasm or sprain with possible nerve impingement and referred Campbell to an orthopedist at Tulane, Dr. Raul Rodriguez for further treatment. However, upon examination of Campbell and after taking numerous x-rays, Dr. Rodriguez could find nothing objectively wrong with Campbell.
In January of 1996, Campbell sought treatment from a team of physicians at Ochsner Clinic led by Dr. Rand Voorhies, a neurosurgeon, and including Dr. Kevin McKinley (neurology), Dr. Richard Wakeman (neuropsychology), and Dr. Douglas Swift (occupational medicine). Dr. Voorhies found no neurological deficits and a bone scan was found to be normal. After his examination, Dr. Voorhies referred Campbell to the other members of his Ochsner team for follow-up work, with Dr. Swift to be his primary treating physician. Dr. Swift concluded that Campbell's problems did not include neurological issues, and after conferring with other members of his team, Dr. Swift referred plaintiff to get "psychological help."
Dr. McKinley treated Campbell from early 1996 until June of that year and testified at trial that at that time he believed that Campbell was faking his symptoms or malingering, and did not recommend Campbell for neuropsychological testing. After conferring with Dr. Swift about the plaintiff, Dr. McKinley testified that he believed there was a "dominant psychiatric component" involved in Campbell's problems. However, in spite of his earlier diagnosis, Dr. McKinley signed an affidavit in 2001 stating that Campbell had sustained brain injury, though he admitted in trial that his opinion was based solely on Dr. Wakeman's evaluation of the plaintiff and that he had not re-examined *973 the plaintiff in light of Dr. Wakeman's diagnosis.
Dr. Richard Wakeman, upon referral by Dr. Swift and Dr. Voorhies, examined Campbell in March of 1996, and administered numerous tests to evaluate his cognitive abilities. Dr. Wakeman's diagnosis at that time was that Campbell suffered a conversion disorder or a somatization disorder, stemming from psychiatric origin.[6] Dr. Wakeman continued to treat Campbell about a dozen times to help him "cope with his headaches and his arm and shoulder pain and neck pain" through September of 1996. During this period of treatment, Dr. Wakeman testified that he found no evidence of long-term memory deficit. The plaintiff returned to Dr. Wakeman in 1999 for additional testing, upon referral by his attorney. After a second examination, Dr. Wakeman concluded that the plaintiff had sustained traumatic brain injury resulting from the February 1995 accident, rendering him permanently disabled. He based this opinion on the presumption that plaintiff had lost consciousness during or immediately after the electrical shock, and testified that in order to have a closed-head injury sufficient to cause a neuro-cognitive disorder, there must be some period of unconsciousness. However, Dr. Wakeman told the jury that on a subsequent visit plaintiff was tested for malingering and the results indicated an abnormal range, suggestive of malingering.
In October, 1996, Campbell began treating with Dr. M. Kaleem Arshad, a psychiatrist, upon the referral of a social worker, Anna Leason. Based upon Campbell's medical history, Dr. Arshad concluded that the plaintiff suffered from an "organic brain syndrome related to the head injury." He opined that the plaintiff suffers a "severe, permanent mental impairment." Dr. Arshad testified that he did not believe that the plaintiff exaggerated his symptoms, but rather he lied to cover his mental deficits, a syndrome called "confabulation." He further expressed his belief that the plaintiff was not competent to testify.
In October 1996, upon referral from Ms. Leason and Dr. Arshad, the plaintiff was examined by Dr. Raphael Salcedo, a neuropsychologist. After administering several tests, he concluded plaintiff had "emotional psychological issues" with "somatic symptoms." Plaintiff's psychological problems complicated the "evaluation process." Dr. Salcedo declined to "assess the neuropsychological impact, if any, associated with this individual's reported injury."
In March 1997, Campbell's attorney referred him for testing at Healthcare Rehabilitation Center in Austin, Texas. Neuropsychological testing there suggested that Campbell sustained traumatic brain injury secondary either to Campbell striking his head or anoxia from the shock. This testing, however, did not include an evaluation for malingering.
The defendants requested an Independent Medical Examination (IME) in April of 1997 by Kevin Bianchini, a licensed neuropsychologist. Dr. Bianchini administered numerous tests, measuring basic mental faculties relating to brain function. In October 2001, Dr. Bianchini re-evaluated plaintiff, concluding that Campbell was malingering, explaining that he
appears to have more impairments than would make sense given the circumstances of those injuries. In fact, substantially more impairments than would *974 make sense.... In addition, on these specific tests designed to pick up faking, he had positive results on them a number of times.
In Dr. Bianchini's opinion, Campbell did not suffer from any "neuro-cognitive impairment."
On January 16, 1997, upon the defendant's request, plaintiff submitted to an IME by Dr. Reny Culver, a psychiatrist. After reviewing Campbell's medical records, Dr. Culver obtained a detailed history from Campbell and observed him for three and a half hours. In Dr. Culver's opinion, Campbell presented no "memory disturbances" or "cognitive problems" and he reached the conclusion that he "was faking his symptoms, that he didn't have anything wrong with him but he was trying to make me think that he had something wrong with him. The term for it in medicine is malingering."[7]
In December 2000, upon referral of Dr. Arshad, Campbell began treating with Marcia Beard Ph.D., a clinical psychologist. Based upon her examination and treatment of Campbell, she expressed the opinion that plaintiff suffered a traumatic brain injury, resulting in severe cognitive deficits and depression.
Todd Meunier, the plaintiff's expert in the field of vocational rehabilitation, after reviewing Dr. Arshad's report and Dr. Wakeman's report, concluded that the plaintiff "could not maintain any kind of competitive employment." However, he admitted if evidence were submitted regarding the plaintiff's activities such as driving, cutting grass, and shopping, his opinion might change.[8]
Finally Cedric Walker, a Ph.D. in biomedical engineering, testified that the switch involved in Campbell's accident measured a voltage of 120 (standard household current), and that less than one amp of electricity passed through Campbell's body based on the absence of an electrical burn. Thus, any nerve damage from this type of electrical shock would occur only within the first twenty-four hours after the shock, and could not develop subsequent to this period. Additionally, he testified that the current flowed "down his left arm, down his torso, and through his feet," and that the current could not have passed through his brain.
From the above testimony and other evidence presented in trial, the jury was exposed to conflicting accounts of what occurred and the resulting injury to the plaintiff. As to what occurred on the day of the accident, the only witness to the accident, Vernon Lewis, testified in trial that the plaintiff lost consciousness as a result of the shock. However, upon cross-examination, and when presented with a deposition in which he had previously stated that the plaintiff did not lose consciousness, Mr. Lewis claimed that he was unsure as to this fact.[9] The primary issue, however, lies in the conflicting diagnoses of medical professionals. Whereas Drs. Arshad, Wakeman, and McKinley (though based solely on the report of Dr. Wakeman), testified that Campbell suffered from brain injury as a result of the accident, *975 there was also substantial evidence, from Drs. Bianchini, Culver and McKinley's first evaluation, as well as tests done by Dr. Wakeman and Dr. Bianchini, that indicate that Campbell was malingering. Additionally, it was the opinion of Drs. Acosta, Rodriguez, and Voorhies, that Campbell had nothing physically wrong with him. Drs. Palmer and Ballard found nothing wrong with Campbell's neuro-cognitive ability, but found a "mild cervical muscle spasm" in his neck along with possible soft tissue injury. Finally, there was testimony from a Ph.D. in biomedical engineering that the brief shock from household current could not have even passed through the plaintiff's brain.
This court stated in Martin, supra, "A jury verdict cannot be set aside on the grounds that the verdict is contrary to the evidence if it is supportable by any fair interpretation of the evidence." 784 So.2d. at 637. This is a case in which there was a dispute among the experts as to whether plaintiff suffered a brain injury as a result of the accident. It is the duty of the jury to evaluate the credibility of each witness, and come to conclusions as to the facts based on these evaluations. Because the plaintiff did not testify in this case, the jury had no opportunity to evaluate his credibility, and had to rely on expert testimony regarding the extent of the injuries he may have suffered as a result of the brief shock. It is apparent to this Court that the jury accepted the defendant's substantial evidence that the plaintiff suffered no brain injury from the shock, and in turn awarded him damages only for the shock itself and soft tissue injury associated with it.[10]

CONCLUSION
While a trial judge does have discretion in granting a new trial, and is entitled to draw his own inferences and conclusions from the evidence as well as evaluate the credibility of the witnesses, he may not interfere with a jury verdict with which he simply disagrees when that verdict is based on a fair interpretation of the evidence. Martin, supra at 636-637. In our case, the jury's verdict is clearly supportable by a fair interpretation of the evidence as there was substantial evidence heard by the jury to lead it to conclude that the plaintiff's injury from the shock was not nearly as serious as claimed by the plaintiff. Therefore, it was an abuse of discretion for the trial court to grant a new trial.

DECREE
For the reasons stated herein, we reverse the judgment of the trial court granting plaintiff's motion for new trial and reinstate the jury verdict of $50,000 in favor of Brian Campbell, et al.
NOTES
[1] Prior to the trial in this matter, Brian Campbell was judicially interdicted and his wife, Melissa Campbell, was appointed his curator. Thus, she represents Mr. Campbell in this matter as his curator.
[2] As discussed infra, the sole witness to the accident was ambivalent in his testimony regarding whether Campbell lost consciousness as a result of the electrical shock.
[3] Although the motion for new trial was argued on June 11, 2002, the District Judge did not rule on the motion until more than four months after the matter had been submitted.
[4] In Martin v. Heritage Manor South Nursing Home, supra at 631-632 this Court explained the different standards to be used by a trial judge in granting a JNOV, versus granting a motion for a new trial:

A motion for a new trial requires a less stringent test than for a JNOV as such a determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. "Although the language is similar between the standards for a JNOV and new trial, there is a real difference between a finding that no evidence existed for a rational jury to reach a particular result and a finding that a jury could not have reached its conclusion on any fair interpretation of the evidence." Gibson, supra at 1336. Notably, in considering whether the verdict was supported by any "fair interpretation of the evidence" on a motion for new trial, the trial judge is free to weigh the evidence and make credibility determinations, and is not required to view the evidence in the light most favorable to the non-movant as on a JNOV motion.
[5] This standard of review is discussed in La. C.C.P. art. 1971 Official Revision Comment (d) ("Although the trial court has much discretion regarding applications for new trial, in a case of manifest abuse the appellate court will not hesitate to set the trial court's ruling aside, or grant a new trial when timely applied for.")
[6] According to the testimony of Dr. Wakeman, a conversion disorder is one that has no physical basis whatsoever, but rather is purely psychiatric in origin. A somatization disorder is one in which the patient suffers real physical pain, but there is no external cause of the pain.
[7] Dr. Culver, among other credentials, has taught classes that teach the detection of malingering at the Tulane Medical Center for the last five to seven years.
[8] There was substantial evidence presented at trial in the form of testimony, receipts, and his handicap drivers license application that the plaintiff had been engaged in all of these activities.
[9] This seems to be crucial to the jury's determination as all the doctors opined that the plaintiff must have lost consciousness for a period of time in order to sustain brain injury of the nature suggested by the plaintiff.
[10] It is Tork's contention, and is supported by the verdict, that the jury followed his recommendation that they award $25,000 to Campbell for cervical and soft tissue injuries, and added another $25,000 for past lost wages.