914 So.2d 1135 (2005)
Roger D. COOK and James W. Davis, Plaintiffs-Appellees,
v.
Luther STOWE, Jr., Defendant-Appellant.
No. 40,372-CA.
Court of Appeal of Louisiana, Second Circuit.
October 26, 2005.
*1136 Dollar Laird, L.L.P. by Johnny E. Dollar, Monroe, for Appellant.
Cotton, Bolton, Hoychick & Doughty, L.L.P. by John B. Hoychick, Rayville, for Appellee.
Before BROWN, GASKINS, and MOORE, JJ.
BROWN, C.J.
In January 2004, plaintiffs, Roger Cook and James Davis, purchased 100 cows for *1137 $625 each from defendant, Luther Stowe, Jr. The deal was made after plaintiffs viewed the cows in Stowe's Texas pasture. Stowe delivered the cows to the West Monroe Sale Barn on January 24, 2004. At that time, plaintiffs rejected two cows because of open wounds on their backs. Defendant refunded the cost of the two rejected cows. Therefore, plaintiffs took delivery of 98 cows at a cost of $61,250.
Plaintiffs contend that defendant guaranteed that all the cows were three to six years old, were five to seven months bred, meaning five to seven months into a nine-month pregnancy, and were bred by Angus or Charolais bulls. Plaintiffs also testified that defendant agreed that he would have a veterinarian check the cows before shipment.
Plaintiffs resold the cows for $60,258.40. Alleging that the cows were not the age or bred as guaranteed, plaintiffs filed this action seeking damages for loss of profit, mental anguish and the cost for feeding the cows longer than they expected.
Defendant denied that he made any guaranty. The contract was made orally, which is common in the cattle trade. The trial court awarded plaintiffs $26,821.60 representing lost profits and feeding costs. Defendant has appealed.

Facts
At delivery, plaintiffs processed the cows through a chute and recorded each cow's ear tag number, the age and month bred, which were marked on the side of the cow in blue paint, and each animal's color. Plaintiffs presumed that the blue paint markings were made by a veterinarian hired by defendant.
A "vet check" is a term pregnancy evaluation performed by a veterinarian, generally costing four dollars a cow. A cow is either "open," meaning not pregnant, or bred anywhere from one month to the end of a nine month term. A calf born early in the year feeds on spring grass and is more valuable than one born mid to late year.
Plaintiff, Roger Cook, testified that he and Davis bought the cows cheap with the intent to quickly resell them for a profit of approximately $200 per cow. Plaintiffs resold the cows on three separate occasions. On February 16, 2004, plaintiffs took 15 of the cows to the West Monroe Sale Barn. A veterinarian checked them before the sale and concluded that 8 of the 15 were more than six years old; 4 of the cows were open; and 3 were in very early stages of pregnancy. Plaintiffs received $8,324 for the 15 cows.
On March 27, 2004, plaintiffs sold 27 cows for a total of $17,735 in Alexandria. Some of the cows were open, bred light (meaning these cows must have been bred in plaintiffs' pasture), or older than six years of age.
On May 25, 2004, plaintiffs sold 54 of the cows for $34,199.40 in West Monroe. If the cows had been five to six months bred at the time plaintiffs had purchased them, then plaintiffs contend that each one would have birthed a calf by that date; however, only 19 of the 54 had birthed calves at this time. According to the veterinarian at the sale barn, 16 cows were seven years of age or older, 21 were open, and 4 were four months bred or less, indicating that plaintiffs' own bull had impregnated them. Some of the cows were "open mouth," indicating extreme age, and some of the calves were clearly not sired by Angus or Charolais bulls.[1]
*1138 Bob Smith owns livestock barns in Monroe and Alexandria and has worked with cattle all of his life. The court recognized him as an expert in the evaluation and sale of cows. Smith testified that he traveled with plaintiffs to Texas to view the cows. According to Smith, defendant guaranteed the cows to be six years old or younger, five and six months bred, some even seven months bred, and that defendant would have each of the cows "vet checked" before delivery. Smith told plaintiffs that the cows as presented were being sold at least $200 per cow below their worth. Smith received a commission from defendant for the sale.
The primary method of determining a cow's age is by the length of its teeth: the shorter the teeth, the older the cow. Smith testified, however, that the deterioration of the teeth depends on the type of grass the cow eats, and the subjective view of the beholder; however, this method is effective in determining if the cow is younger than five years or older than seven years.
The district court examined Smith on the issue of damages. According to Smith, a cow that was bought on January 24, 2004, and sold on February 16, 2004, that was four and a half years old and six months bred by an Angus or Charolais bull, would bring in $800 to $900; the same cow would be eight months bred on March 27, 2004, and would sell for $850 to $950; and the same cow, with a one month old calf on May 25, 2004, would be worth between $900 and $1,200.
When the deal was made in defendant's Texas pasture, Smith stated that he had not inspected any of the cows' mouths or attempted to determine their pregnancy status. He simply took defendant's word. Smith testified that he purchased some of the cows himself from plaintiffs at two of the sales and recognized them as the same cattle sold by defendant due to their 3-S or 3-5 brands (an "S" and a "5" looked the same to Smith).
William Gibson testified that he has worked with cattle most of his life, which included experience working at sale barns. He stated that he sat down with plaintiffs, looked over the sales receipts for the cows, and helped make out three charts for what the cows should have sold for if they matched the guaranty allegedly made by defendant.
Kenneth Sanders, Sr., lives on a corner of plaintiffs' property. Sanders testified that he did not work for plaintiffs, but would feed plaintiffs' cows and ride through them on weekends. According to Sanders' testimony, he helped plaintiffs take delivery of the cows in Monroe; the other cows on the plaintiffs' land did not mingle with the cows in question; the cows in question never left plaintiffs' land except for the three times the cows were to be sold; he helped plaintiffs those three times; and plaintiffs did not sell any other cows at the same time he sold the cows in question. He also testified that the cows were branded with a "3" something. John Michael Chisholm, a former employee of plaintiffs, also testified that there were other cows on plaintiffs' land but that they did not mingle with the cows plaintiffs purchased from defendant. We can't help but note that if plaintiffs are correct in stating that their bulls impregnated some of these cows, then there must have been some "mingling."
Joe Lively, defendants' brother-in-law, informed plaintiffs of defendant's intention to sell his cows. Lively testified that he, plaintiffs, Bob Smith, and defendant visited the pasture and inspected the cows in question in January 2004. According to Lively, defendant stayed in his truck due to the cold, made no guarantees to the plaintiffs except maybe that he would have *1139 the cows vet checked. Lively pointed out that Smith was the one selling the cows for a commission. Joe Lively said that he was not acting as an agent. Lively remembers plaintiffs demanding that seven of the cows that were open be replaced with five to six month bred cows and defendant stating that he would do so before delivery. Lively said that all or the vast majority of the cows were five to six months bred.
Lively testified that after plaintiffs suspected a problem with the cows, he asked defendant for a record of the vet check, but defendant told Lively that he could not find a copy of the vet check record. To date, only an account summary of veterinarian work in October 2003 has been produced by defendant, which states that the cows were marked with orange paint, not blue paint, but there is no documentation as to the results of any vet check, or whether the work related to the cows in question. Further, Lively testified that Smith had seen the cows in plaintiffs' pasture, contrary to Smith's testimony, and had remarked to Lively that the cows had lost a lot of weight. Lively testified that William Gibson told him that the cows stood waist deep in mud which was bad for them, contrary to Gibson's testimony.
According to defendant, he paid Bob Smith to sell the cows, and made no guarantees for the cows. He sold them as he bought them: the cows were supposed to be six years old or younger, and he never makes guarantees as to whether a cow is bred. Further, defendant testified that he had the cows vet checked in October 2003, and that as far as he knew most of the cows were bred, and he did not promise to have the cows re-vet checked before making delivery.
Defendant testified that the blue paint markings on the cows, showing the cows' age and how many months bred, were made by his employees before delivery. The employees read the ear tags attached by the veterinarian in October for the right age and number of months bred for each cow. Defendant further testified that Smith told him that the cows were starving and up to their waists in mud on plaintiffs' land, contrary to Smith's testimony.
Plaintiffs admitted that defendant did spend most of the time in his truck, but that they still talked, and later they discussed the sale in defendant's house. A few days passed before the cows were delivered. Plaintiffs testified that the delay was due to defendant having trouble getting a vet check, but according to defendant, the delay was due to plaintiffs' difficulty in getting the trucks needed for transport.
Defendant also argues that the difference between the amount plaintiffs got from selling the cows and the amount plaintiffs paid for the cows comes to only $991.60, which can be largely explained by the death of one of the cows.

Trial Court's Ruling
The district court held that there was a valid contract for $625 a cow, that the cows were to be under six years of age, five to six months bred by either Angus or Charolais bulls, and that defendant would have the cows vet checked before making delivery. The court found that there was a breach of this contract in that some of the cows were not bred, some of the cows were older than six years, and some of the cows had been bred by bulls other than Angus and Charolais.
As to evaluating the damages, the district court considered the testimony of both experts, the uncertainties of the age and gestation period of each cow, and other unforeseen events. The charts created by plaintiffs and Gibson do not seem to have been factors in the court's estimation.
*1140 As to the sale on February 16, 2004, the court decided that if the cows had been as guaranteed, then they would have sold for $750 per cow (for the 15 sold on that day) for a total of $11,250. Plaintiffs actually received $8,324 for the cows, for a loss of $2,926.
As to the sale on March 27, 2004, the court found that the average value for the cows should have been $850, as they should have been further into their pregnancies. Twenty-seven cows were sold that day, so the price should have been $22,950. Plaintiffs actually received $17,735 for the cows, for a loss of $5,215.
As to the sale on May 25, 2004, the court found that the 54 cows should have been sold for an average of $950 each, for a total of $51,300. Plaintiffs actually received $34,199.40 for the cows, for a loss of $17,100.60.
According to the trial court's calculations, the total loss for the cows was $25,241.60. The court further found that the cost of feeding the cows for longer than expected amounted to $1,580, bringing the total damages to $26,821.60.

Testimony from Hearing on Motions for New Trial
During the hearing on the motion for a new trial, defendant's counsel examined Dr. Maxwell Lee, Jr., a state veterinarian who has worked for the Louisiana Department of Agriculture and Forestry for the past 15 years. He is responsible for livestock disease control and eradication programs, and regulation of stockyards and livestock dealers in the state.
Dr. Lee was presented with two check-in forms (one for each plaintiff) for the February 16, 2004, sale at West Monroe Livestock Barn. Dr. Lee was also shown two forms he identified as Livestock Brand Commission Cattle Check-Ins. Dr. Lee testified that the Louisiana Brand Commission ("LBC") generates documents on all cattle that are sold at sale barns to prevent theft. Check-ins are usually generated at the same time the check-in is conducted.
Check-ins list the back tag number, a brief checkoff description of the animal, the name/date of the sale, and any brands on the animal. According to Dr. Lee, the law requires that the branding inspectors record all visible brands on all animals coming through all sale barns in the state of Louisiana. These public documents are sent to Baton Rouge to the Brand Commission Office where they are put on file.
Dr. Lee received the check-in records for February 16, 2004, for cows checked in by plaintiffs at the West Monroe Sale Barn. Of the 15 cows sold by plaintiffs only 5 had a 3-S or 3-5 brand. Dr. Lee noted that it is sometimes difficult to distinguish between S and 5 brands.
Dr. Lee testified that the check-ins for the PSC barn in Rapides Parish on March 26, 2004, showed that the CD Cattle Company checked in no cow with a 3-S or a 3-5 brand (or any brand at all) on that day. Apparently, plaintiffs own and operate the CD Cattle Company.
Dr. Lee testified that the check-ins for the West Monroe Sale Barn on May 24, 2005, show that of the 73 cows the CD Cattle Company put through for sale, only 20 were branded with a 3-S or 3-5.
Dr. Lee testified that he was never contacted or subpoenaed for the trial conducted on December 21, 2004.
Joe Lively, defendant's brother-in-law who testified at trial, was at the West Monroe Sale Barn when plaintiffs took delivery of the cattle. Joe Lively testified that all the cows were branded with a 3-S on their left rear hip. He watched them pass through a narrow chute while the *1141 plaintiffs inspected each. He stated that defendant brands all of his adult cattle.
Joseph C. Lively is defendant's nephew. Joseph Lively testified that he went to defendant's Texas ranch once a year to hunt in either November or December. At times he visited on weekends and helped defendant give shots, cut cattle, and repair fences. They would both ride over the entire property on four wheelers. He said that all of defendant's cows were imprinted with a 3-S brand.
Defendant, in argument, referred to Bob Smith's trial testimony that defendant's cows had the 3-S or 3-5 brand. Kenneth Sanders, plaintiffs' neighbor who fed the cows, recalled the cows as having a 3-something brand, at first guessing 3-M, but admitting that it may have been a 3-S. In any event, that the 3 was "real visible." Defendant further points out that plaintiff, Roger Cook, testified at trial that he lost the receipt for sales at the West Monroe Sale Barn. When he went to the West Monroe Sale Barn's computer to recall the data, the normal employee was out, so he could not print the information so it appears he simply wrote down the information from the screen by hand.
Defendant compared plaintiffs' exhibit P-6 (plaintiffs' recap from the February 16 sale) with check-in reports provided by Dr. Lee. Of the 15 cows sold, 7 of them (five of which bore the 3-S brand) were as guaranteed and did not bring a loss. Defendant compared exhibit P-8 (plaintiffs' recap from the March 26 sale) with Dr. Lee's check-in reports, which shows that all 27 of the cows sold for a loss, and none of them bore a brand of any kind. Finally, defendant compared plaintiffs' exhibit P-10 (plaintiffs' recap from the May 25 sale) with Dr. Lee's check-ins, which shows that of the total of 54 cows plaintiffs' sold there, only 20 of them had calves by their side, and those 20 were branded with a 3-S.
Defendant argues that he expected plaintiffs to produce the best evidence of their case, but they did not, as the best evidence would have been the official records of the State of Louisiana from the livestock barns. Defendant's trial lawyer could have gotten the records, but it wasn't until this evidence was presented that it occurred to him that something might be amiss as to which cows were actually sold by plaintiffs. Thus, the records were sought after trial.
Plaintiffs argued that five witnesses at trial testified that the cows sold were the same cows sold to plaintiffs by defendant. Further, the check-in records were public documents that defendant could have obtained anytime with the exercise of due diligence; thus, it would be unfair to force plaintiffs to suffer the cost and time of a new trial because of defendant's lack of due diligence.
The trial court denied the motion for a new trial.

Discussion
When factual findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact's finding. Stephens v. Fuller, 39,918 (La.App.2d Cir.06/29/05), 907 So.2d 917. When there are two permissible and reasonable views of the evidence, the fact finder's choice cannot be manifestly erroneous or clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Stephens, supra.
In the trial at hand, witnesses gave contradictory testimony. Most of the witnesses were either employees or family members of the parties. All of the parties agreed that there was an oral contract to sell the cows. What was in dispute was whether there was a guaranty that the cows were of a certain age and condition, *1142 and, if so, what would be the proper remedy.

The Guarantee
Bob Smith negotiated the original sale for defendant for a commission. Smith testified that defendant promised a vet check before making delivery, which he did not do, and further testified as to the guaranty made as to the age and month bred of each cow. Although defendant denied making any guaranty, he asserted in the new trial motion that the cows sold by plaintiffs at auction with the 3-S brand were in fact of the required age and "bred" status. Defendant's brother-in-law, Joe Lively, testified that defendant agreed to replace seven open cows with bred cows. These statements diminish defendant's argument that he would have never sold the cows that cheap if they were in fact as allegedly guaranteed. Given this testimony, this court cannot find the lower court's ruling to be clearly wrong or manifestly erroneous.

The Award
LSA-C.C. Art. 2529 as written by the legislature in 1993 provides:
Art. 2529. Thing not of the kind specified in the contract
When the thing the seller has delivered, though in itself free from redhibitory defects, is not of the kind or quality specified in the contract or represented by the seller, the rights of the buyer are governed by other rules of sale and conventional obligations.
Acts 1993, No. 841, § 1, eff. Jan. 1, 1995.
The revision comments state:
(a) This Article is new. It does not change the law, however. It has been introduced in order to enhance the distinction between redhibition and breach of contract, and to eliminate the possibility of confusion that arose from the pertinent Articles in the Louisiana Civil Code of 1870. In addition, it gives legislative formulation to a principle implicit in the Articles of the Louisiana Civil Code of 1870 governing redhibition.
(b) The provisions of Article 2529 of the Louisiana Civil Code of 1870, to the effect that a seller's mistaken declaration as to quality gives rise to redhibition when such quality was the buyer's principal motive for entering the sale, have been eliminated. That Article was of uncertain origin. It was introduced into the Civil Code in 1825; the French Civil Code contains no corresponding provision. Revised Article 2529 provides that where a thing of a different kind or quality from that specified in the contract is delivered, but the thing is free of redhibitory defects, the rights of the buyer are governed by other rules of sales and conventional obligation but not by the Articles on redhibition.
(c) Under this Article, decisions such as the one rendered in Rey v. Cuccia, 298 So.2d 840 (La.1974), concluding that redhibition is available even though the thing sold is in itself free of defects, are legislatively overruled. In all such cases the buyer may reject the thing or may sue for damages or dissolution or both.
La. C.C. Art.1995 provides:
Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived.
See Security National Bank of Shreveport v. Terrell, 482 So.2d 919 (La.App. 2d Cir.1986).
Having found a guarantee as to the age, months bred, and paternity for the cows in question, the court followed the expert testimony of Smith and Gibson in *1143 determining what the cows should have been worth. The trial court calculated the difference between what the cows should have sold for, and what they did in fact sell for, along with the cost of keeping the cows longer than expected and reached a total of award of $26,821.60 in damages. There was credible evidence at trial to support this award, thus we cannot find this ruling to be clearly wrong or manifestly erroneous.

Motion for New Trial
The new trial motion is troubling. It directly questions plaintiffs' credibility as to whether some of the cows sold at auction were those purchased from defendant. State documents from the Branding Commission showed that many of the cows sold did not have the 3-S brand and that the cows with the 3-S brand were of the age and bred as guaranteed.
In order to enable the appellate court to correctly apply the standard of review to a denial of a motion for new trial, the facts and evidence presented in each case are obviously significant. The trial record must be examined carefully to determine if the trial court abused its discretion in deciding that the verdict was or was not supportable by "any fair interpretation of the evidence." Thus, the evidence and testimony is examined in order to correctly apply the standard of review. Martin v. Heritage Manor South Nursing Home, 00-1023 (La.04/03/01), 784 So.2d 627, Campbell v. Tork, Inc., 03-1341 (La.02/20/04), 870 So.2d 968. The granting or denying of a motion for new trial rests within the wide discretion of the trial court, and its determination should not be disturbed absent a clear abuse of discretion. Armstrong v. Horseshoe Casino, 36,927 (La.App.2d Cir.03/05/03), 839 So.2d 1028.
Louisiana Civil Code of Procedure article 1972 provides the court with certain peremptory grounds wherein a motion for new trial should be granted. Subsection Two provides that a new trial shall be granted, upon contradictory motion of any party, in the following case:
When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
Louisiana Civil Code of Procedure article 1973 provides that a court may use its discretion to grant a new trial in any case if there's good ground therefor, except as otherwise provided by law.
The trial court was convinced that its judgment was not contrary to the law and evidence as to the testimony and documentary evidence presented at trial. As to the new evidence presented at the hearing on defendant's new trial motion, the trial court held that it could see no reason why the defendant could not have, with due diligence, obtained the public documents presented at the motion for a new trial before or during the original trial. The trial court then denied the motion for a new trial.
We note that this was a bench rather than a jury trial. The trial court heard all the evidence and could have judged the effect, if any, of the new documents and testimony on his previous ruling. The trial court did not, however, rule on the credibility of the new evidence (which issues would have included whether some of the cows sold by defendant were in fact not branded). Instead, the court denied the new trial motion on the basis that defendant could easily have obtained these Branding Commission records before the original trial but did not do so.
We agree that defendant could have easily obtained these branding records before *1144 the original trial, as they were public documents. Why he did not do so may be explained by his defense strategy. Defendant consistently maintained that the cows were not guaranteed to be under seven years old, several months bred or bred by Angus or Charolais bulls. Only after this defense failed did he then seek these records and claim fraud on plaintiffs' part.

Conclusion
For the reasons set forth above, the judgment of the trial court is affirmed.
NOTES
[1] Cook testified about the death of one cow. It is unclear what happened to the last of the 98 cows plaintiffs purchased from defendant.