MOORE, J.
The father, mother and brothers of 12-year-old Cody Ebarb appeal a jury verdict that rejected their claim of medical malpractice arising from Cody’s death by stroke in the Willis-Knighton Health System Intensive Care Unit. For the reasons expressed, we affirm.

Factual Background

Cody suffered from several preexisting medical problems, including Epstein-Barr syndrome (a kind of viral chronic fatigue syndrome), herpes virus of the eye, and suspected Marfan syndrome (a genetic disease of the connective tissue). Cody was also double-jointed and often “popped” various joints. He had spent much time in medical treatment, and his mother described him as not a robust child.
On Sunday, November 4, 2001, the family went to their hunting lease to ride four-wheelers. After an unusually active day for him, Cody said he had “popped” his neck, was feeling dizzy and seeing an unusual light, but he begged not to be taken to the hospital again.
The next morning, Ms. Ebarb was driving Cody to his pediatrician, Dr. Sudha Rao, but stopped to drop off his brother at school. At the school, Cody suddenly said he couldn’t see, then fell to the floor and started moaning. An ambulance carried him to Willis-Knighton South. EMTs noted only that he was having seizures.
Cody reached the ER at 8:30 am. Dr. John Felty, an emergency medicine physician on contract to Willis-Knighton, was on duty. Accounts of events in the ER and ICU varied widely.
| ¡According to Ms. Ebarb, she told Dr. Felty about Cody’s symptoms of the previous night and asked him to call Dr. Rao, but he refused, saying he would not call her until he ran some tests. Ms. Ebarb also testified that even though he could not open his eyes or speak, Cody definitely was aware of his surroundings and communicated with them by nodding his head, notably during a spinal tap procedure. The nurses’ notes at 10:40 am seem to confirm, “Patient responds to verbal stimulus.” Ms. Ebarb testified, however, that Dr. Felty basically abandoned Cody after about 10:30 am, never telling her any test results, and she could not find a nurse to help them.
About 2:00 pm, Dr. Eric Chen, a pediatrician, arrived. Ms. Ebarb tried to tell him the whole story, but he was not interested; he merely glanced at Cody, ordered some Ativan (a widely used sedative and anticonvulsant), and left. Cody’s pediatrician, Dr. Rao, did not arrive until about 5:00 pm, and according to Ms. Ebarb she was irate to find Cody still in the ER, not the ICU; he was promptly transferred. Ms. Ebarb testified that by this time, Cody was much worse: he was unable to move his arms or communicate, and was sweating profusely.
Cody was moved to the ICU around 6:30 pm, at which time Dr. James Kim, a neurologist, and Dr. Giao Do, a pediatric in-tensivist, arrived. According to Ms. Ebarb, Dr. Kim told her Cody was stable and doing fine, and they would run some more tests in the morning.
The next morning, however, while Ms. Ebarb had run home to fetch Cody’s toiletries, Cody went into cardiac arrest and *206 “coded.” There was no Rautopsy, but an MRI taken while the boy was on life support showed a dissected basilar artery, a form of stroke. The family took him off life support on November 10.
Dr. Felty agreed that he did not immediately call Cody’s pediatrician, Dr. Rao, but insisted that the standard of care required him first to perform a basic emergency exam. He described running a battery of tests to explore and rule out the normal causes of symptoms like Cody’s: a CT scan, spinal tap and blood chemistries, which were not complete until about 12:15 pm, and were all negative. He also gave Cody a small dose of Ativan to control the seizures. He admitted not performing a full neurological exam because Cody could not communicate and Was flailing his limbs involuntarily. He disputed Ms. Ebarb’s recollection that Cody was calmly nodding in response to questions; nurses’ notes at 3:30 pm confirmed that the patient was “thrashing in bed, continues unresponsiveness.” He also admitted not ordering an MRI, explaining that subspecialists, not ER physicians, normally do so, and that even high-definition MRI images might fail to show an occlusion during the first six hours.
Once the tests were complete, Dr. Felty called Dr. Rao, but she must have been busy because her partner, Dr. Chen, came. Dr. Felty testified that he verbally conveyed Cody’s situation, and entrusted the patient to Dr. Chen at that time. Dr. Felty admitted he did not “chart” all the activities he related at trial, but insisted he did them all, satisfying his standard of care. Finally, he stated that a tear in the basilar artery — which is sheathed by the spine — is exceedingly rare, especially in pediatric patients.
|4Pr. Chen testified that he took the call for his partner, Dr. Rao, came to the ER about 1:30 pm, and got a verbal synopsis from Dr. Felty. He found Cody thrashing, moaning, unresponsive and difficult to examine. Like Dr. Felty, Dr. Chen could make no definitive diagnosis, but he ordered an EEG to test for epilepsy and seizures, a consultation with Dr. Kim, the neurologist, and ordered Cody to the ICU. He was unaware that after this order, Cody spent several more hours lying in the ER. Dr. Chen added that he verbally relayed his findings to Dr. Rao, but did not chart any of his activities. His final involvement in the case was his phone call to Dr. Kim.
Dr. Giao Do, the pediatric intensivist, testified that he saw Cody in the ICU about 7:30 pm. He did not think Cody was showing classic signs of a stroke, so he felt an immediate MRI was not needed. After consulting with Drs. Rao and Kim, he scheduled an MRI and repeat CT scan for the following morning. By the next morning, unfortunately, Cody had coded, and the MRI occurred while he was on life support.

Procedural History

The Ebarbs filed a claim with the commissioner of insurance against Willis-Knighton and the various doctors: Felty, Chen, Do, Rao and Kim. The medical review panel (“MRP”) unanimously absolved all healthcare providers, finding the evidence did not support the conclusion that any of them breached the applicable standard of care. In written reasons, the MRP found no “deterioration of the patient’s condition while in the ER” and that because of the nature of the case, the “most competent general neurologist would not correctly diagnose this condition early on.”
IsThe Ebarbs then filed this suit against Willis-Knighton and Drs. Felty, Chen, Kim and Do. Dr. Rao was not named as a defendant, and Dr. Do was dismissed voluntarily in August 2006. The matter proceeded to a five-day jury trial in August *207 2008. The Ebarbs and Drs. Felty, Chen and Do testified as outlined above; Drs. Kim and Rao did not testify.

The Expert Testimony

Dr. Walter Simmons of Scottsdale, Arizona, testified for the Ebarbs as an expert in emergency medicine with experience in pediatrics. His position was that an MRI performed shortly after Cody arrived in the ER would have shown the basilar artery dissection and improved his chances of survival. He strongly criticized Dr. Felty for failing to consider vascular injury, order an MRI, run a complete workup, or call for consultation sooner, and for keeping an incomplete chart. He testified that an ER doctor’s standard of care was to order an MRI; if Willis-Knighton could not do it, Dr. Felty could have sent Cody to Parkland Hospital in Dallas, which had more advanced equipment.
Dr. Simmons also criticized Dr. Chen for taking no history, and for calling Dr. Kim without conveying that the case was an emergency. He criticized Willis-Knighton for not monitoring Cody in the ER and not promptly transferring him to ICU when Dr. Chen so ordered. Dr. Simmons agreed, however, that basilar artery injury is exceedingly rare in children, and would not have been his first diagnosis, but he maintained that it is not 100% fatal.
| i;Dr. James Kopitnik of Casper, Wyoming (and formerly of Parkland in Dallas), testified for the Ebarbs as an expert in neurosurgery. He assumed that Cody had an embolus or TIA (ministroke) on the way to school, and that EMTs mistakenly labeled it as a seizure, with the result that doctors never considered stroke as the culprit. He conceded that Dr. Felty’s initial evaluation was appropriate, but like Dr. Simmons, Dr. Kopitnik thought a prompt MRI would have identified the clot in time for doctors to give Cody anticoagulants. He also suggested an arteriogram to pinpoint the exact location of the blockage. He considered it a breach of the standard of care for Dr. Felty not to order these tests while Cody was plainly deteriorating.
Dr. Kopitnik concluded that Cody actually died from hydrocephalus (excess spinal fluid accumulated in the brain); he said a minor drainage procedure called ventri-culostomy could have remedied this. He also suggested, as intervention, direct surgical repair, a bypass around the artery, or even “cleaning out” the artery. He sharply criticized Dr. Felty’s poor charting. On cross-examination, Dr. Kopitnik conceded that if Cody really had a torn basilar artery, it was a rare condition with a high mortality rate.
Dr. Ann Henderson-Tilton, a pediatric neurologist from Galveston, Texas, served on the MRP and testified for Willis-Knigh-ton and Dr. Felty. She found that Cody’s neurological “event” began Sunday night, and by the time he reached the ER Monday morning in an altered mental state and unable to communicate, his condition was irreversible. She agreed with Dr. Felty that ER doctors do not order MRIs, and an MRI would have been difficult with a flailing child. Also, an anticoagulant could have been |7hazardous for a child in Cody’s state, and the ventriculostomy— basically boring a hole in the back of the head — would not have addressed the underlying problem. Dr. Tilton felt that all healthcare providers acted appropriately in this rare, irreversible case.
Dr. Donald Smith, a neurosurgeon at LSU Health Sciences Center in Shreveport, testified for Willis-Knighton and Dr. Felty. He concluded that Cody had a rare vertebral artery stroke at school on Monday morning, and by the time he got to the ER, Dr. Felty could not give a full neurological exam. He testified that an earlier MRI might have clarified the diagnosis, but not altered the outcome; he specifical *208 ly disagreed with Dr. Kopitnik on this point. Dr. Smith was emphatic that Cody’s condition was rare and lethal; he stated that no surgical intervention could have saved him.
Dr. John Willis, a pediatric neurosurgeon at Ochsner Health System in New Orleans, served on the MRP and testified for Dr. Kim. In his view, Cody’s symptoms upon arrival at the ICU still did not suggest a stroke; hence, Dr. Kim met the standard of care by ordering the EEG Monday night and the MRI Tuesday morning. He also felt that Dr. Felty’s series of tests earlier that day was appropriate. Like Dr. Smith, he stated that a dissected vertebral artery is exceedingly rare, and not all pediatric neurologists could diagnose it. He also agreed with Dr. Smith that by the time Cody reached the ICU, there was no chance of saving him.

Action of the District Court

After deliberating about two hours, the jury found that each defendant’s conduct was not a breach of the standard of care and not a cause Rof Cody’s death. After the court rendered judgment dismissing all defendants, the Ebarbs moved for JNOV or new trial as to all except Dr. Chen. The court denied these motions, and the instant appeal followed.

The Parties’ Positions

By three assignments of error, the Ebarbs contend (1) the jury verdict was clearly wrong and manifestly erroneous; (2) they were entitled to a JNOV; and, alternatively, (3) they were entitled to a new trial. Although they concede the case is highly factual, they argue that the defense experts’ testimony was not supported by the facts, and the documents and objective evidence so undermine those experts’ findings that manifest error is present. In support they cite Salvant v. State, 2005-2126 (La.7/6/06), 935 So.2d 646.[1] They contend that Dr. Felty did not adequately diagnose Cody’s condition upon arrival in the ER. Specifically, they urge that he failed to order an MRI, which according to Drs. Simmons and Kopitnik should have been an automatic and would have identified the problem in time to take the surgical actions recommended by the defense experts. Further, Cody deteriorated while in the ER, an observation that should have alerted Dr. Felty and the nurses that he was having a stroke rather than a seizure. They argue that the Ati-van ordered by Dr. Felty actually masked the symptoms of stroke. They also contend that Dr. Felty breached the standard by not promptly calling Dr. Rao, by abandoning Cody after noon on Monday and by keeping a sloppy chart.
|¡)Dr. Felty and Wilhs-Knighton respond that the evidence was overwhelming that “nothing could have been done to change the outcome regardless of the diagnosis,” as aptly stated by Drs. Tilton and Smith. They also cite their experts’ view that ER physicians should not normally order MRIs; that an MRI would have been difficult with a squirming child; and that, at any rate, it might not have detected the clot. They urge it was reasonable, and within the standard of care, to explore and eliminate other, more likely causes of Cody’s symptoms than a blocked artery in the neck. They reiterate that Cody’s condition was so rare that it eluded not only Dr. Felty, but every other specialist on the case. Finally, they submit that although the ER chart is less than perfect, the jury did not abuse its discretion in finding that Cody did not substantially deteriorate while he was in the ER. They submit that the verdict should be completely affirmed.
*209 Dr. Kim has filed a brief, chiefly to remind the court that the Ebarbs did not name him as an appellee. He also urges that no expert found that he breached the applicable standard of care.

Applicable Law

To establish a claim for medical malpractice, the plaintiff must prove, by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) that the defendant breached that standard of care; and (3) a causal connection between the breach and the resulting injury. La. R.S. 9:2794 A; Samaha v. Rau, 2007-1726 (La.2/26/08), 977 So.2d 880; Snelling v. LSU Health Sciences Center, 43,332 (La.App. 2 Cir. 6/4/08), 986 So.2d 216, writ denied, 2008-1322 (La.10/3/08), 992 So.2d 1013. A | ipphysician is not required to exercise the highest degree of care possible; rather, his duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. Fusilier v. Dauterive, 2000-0151 (La.7/14/00), 764 So.2d 74. Stated another way, a physician is not held to a standard of absolute precision; rather, his conduct and judgment are evaluated in terms of reasonableness under the existing circumstances and not with the benefit of hindsight. Lowrey v. Borders, 43,675 (LaApp. 2 Cir. 12/10/08), 1 So.3d 635, writ denied, 2009-0043 (La.3/6/09), 3 So.3d 487.
Because the plaintiffs have not shown any legal error that interdicted the fact-finding process, the manifest error standard applies. Under this standard, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Sal-vant v. State, supra. Even if it would have decided the case differently, the appellate court must not reweigh the evidence or substitute its own factual findings. Id. Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or plainly wrong. Id. Where documents or objective evidence so contradict a witness’s story that no rational juror could credit it, the court of appeal may find manifest error even in a finding purportedly based on a credibility determination; however, when such factors are not present, and the finding is based on a credibility call, that finding can virtually never be manifestly erroneous or plainly wrong. Id.; Jackson v. Tulane Med. Center Hosp. & Clinic, 2005-1594 (La.10/17/06), 942 So.2d 509.
InThe grant of a JNOV under La. C.C.P. art. 1811 is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. Forbes v. Cockerham, 2008-0762 (La.1/21/09), 5 So.3d 839, and citations therein. If there is evidence opposed to the motion for JNOV of such quality and weight that reasonable and fair-minded people, in the exercise of impartial judgment, might reach different conclusions, then the motion should be denied. King v. Brown Dev. Inc., 43,827 (LaApp. 2 Cir. 2/4/09), 4 So.3d 231, writ denied, 2009-0499 (La.4/17/09), 6 So.3d 796.
A new trial shall be granted, upon contradictory motion of any party, when the verdict or judgment appears clearly contrary to the law and the evidence. La. C.C.P. art. 1972(1). Although the grant or denial of a motion for new trial rests within the trial court’s wide discretion, the court cannot set aside a judgment if it is “supported by any fair interpretation of the evidence.” Campbell v. fork Inc., 2003-1341 (La.2/20/04), 870 So.2d 968, and citations therein; Cash Point Plantation *210 Equestrian Center v. Shelton, 40,647 (La.App. 2 Cir. 1/25/06), 920 So.2d 974.

Discussion

The Ebarbs’ initial complaint is that Dr. Felty failed to recognize the symptoms of stroke soon after Cody arrived in the ER. The record shows, however, that Cody’s symptoms—falling down, flailing arms and legs, loss of speech— were consistent with a seizure or “altered mental state.” Dr. Do, the pediatric inten-sivist, testified that even when he saw Cody at 7:30 pm [ ^Monday, he did not see “classic signs of stroke.” Dr. Felty testified, with corroboration from Dr. Tilton, that sound ER practice was to test for the common causes of the observed symptoms, and that the series of tests administered, including the CT scan, spinal tap and blood chemistries, were proper to accomplish this. Even Drs. Simmons and Kopitnik admitted that injury to the basilar artery is exceedingly rare in children. Only Dr. Kopitnik testified that “stroke has to be at the very top of your diagnosis,” a view which the jury may have considered tinged with hindsight. On this record, the jury was entitled to find that Dr. Petty’s initial workup was reasonable and met the standard of care for an ER physician treating this kind of patient.
The Ebarbs’ leading complaint, that Dr. Felty failed to order an MRI which would have identified the problem sooner, was also subject to conflicting expert opinion. Dr. Felty and the defense experts testified that it is not the role of an ER doctor, but of a consulting subspecialist, to order an MRI. Dr. Simmons, the Ebarbs’ expert in emergency medicine, disagreed, but admitted that it was unusual for him to order an MRI. Even so, both Dr. Simmons and Dr. Kopitnik strongly felt that the MRI would have identified the source of Cody’s problem, and we would perhaps agree that on a strong showing of need, even an ER physician’s standard of care might include ordering an MRI. Dr. Tilton felt just as strongly that it would have been impossible to take an MRI on a squirming child for whom additional sedation was not indicated. Dr. Felty also testified that even an MRI might not have disclosed the damage to the artery until several hours after the [13initial injury. This conflicting evidence would support a finding that ordering the MRI in this instance might have represented the highest degree of care, but the jury was entitled to find that Dr. Felty did not breach the ordinary standard of care.
Overlying the questions of standard of care is the issue of causation, which was made more difficult by the lack of an autopsy. Dr. Tilton testified that Cody suffered his neurological event on Sunday evening, and by the time he reached the ER he had no more than a 1% chance of survival without a severe brain deficit. Dr. Smith theorized that Cody had a stroke at his brother’s school on Monday morning, when he lost his vision, but that given the size of the infarct, survival was “unlikely” without severe neurological deficits. Dr. Willis also felt that Cody suffered a stroke when he fell down at school, and by the time he reached the ER the event was “not survivable.” Dr. Simmons did not state when the injury occurred, but he agreed that there was a “short window” to diagnose it. Dr. Kopit-nik felt that a ministroke occurred on the way to school, and that Cody could have been treated effectively had he not been allowed to lie for hours in the ER. Dr. Kopitnik also testified that giving Cody an anticoagulant like Heparin, and performing a ventriculostomy or bypass, or transferring him to a hospital in Dallas, would have given him a “good chance” of survival. Dr. Tilton, however, testified that bor- *211 mg a hole in the skull to relieve pressure would not have fixed the underlying problem, and Dr. Smith stated that no surgical intervention would have changed the outcome. Based on common experience, the jury could reasonably dismiss the practicability of placing a Impatient like Cody in an ambulance for a three-hour ride to Dallas. This record easily shows by a preponderance of the evidence that Cody could not have survived, whether Dr. Felty satisfied or deviated from the standard of care. The jury was not plainly wrong to find a lack of causation.
The finding of no causation obviates the need to analyze extensively the remaining factual issues posed by this record. Ms. Ebarb testified, and an early nurses’ note confirms, that as late as 10:40 am Monday, Cody could respond to verbal stimulus. However, Dr. Felty could not recall that Cody ever did so, and a later nurses’ note showed “continued unresponsiveness.” This raises the question of whether, contrary to the MRP’s opinion, Cody really did deteriorate in the ER? There was no explanation for why Cody lay in the ER for four hours after Dr. Chen ordered him to the ICU. If any intervention could have helped, this untoward delay would have diminished its utility. Finally, there is the disturbing absence, in both Dr. Felty’s and Dr. Chen’s physician’s notes, of any indication that they performed even a small fraction of the measures they described at trial. As in Willis v. Smith, 43,958 (La. App. 2 Cir. 1/14/09), 999 So.2d 1244, the jury apparently accepted the doctors’ trial testimony over their sketchy charts.
In different circumstances, these anomalies may well have tilted the scale in favor of a finding of liability. On the present record, however, they do not offset the lack of evidence to prove the essential elements in this tragic case or establish a showing of manifest error. Salvant v. State, supra. They also do not point “so strongly and overwhelmingly in favor” of the Ebarbs that a JNOV was warranted, Forbes v. Cockerham, supra. Finally, | lsthe district court did not abuse its vast discretion in denying the motion for new trial. Campbell v. Tork, supra.

Conclusion

For the reasons expressed, the judgment is affirmed. Costs are to be paid by the appellants, the Ebarbs.
AFFIRMED.

. Salvant actually reinstated a judgment in favor of the healthcare providers.