# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 05-396

**NORMAN MITCHELL**

**VERSUS**

**DIAMOND OFFSHORE DRILLING, INC.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 98949-C
HONORABLE JOHN E. CONERY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**SYLVIA R. COOKS**
**JUDGE**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Oswald A. Decuir and Marc T. Amy, Judges.

**AFFIRMED.**

**Gregory A. Dupuy**
**Dupuy & Dupuy**
**Heritage Plaza, Suite 1000**
**Metairie, LA 70005**
**(504) -**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Norman Mitchell**

**Christopher B. Siegrist**
**407 Roussell Street**
**Houma, LA 70360**
**(985) 879-2427**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Diamond Offshore Drilling**

**Cameron B. Simmons**
**1440 Main Street**
**Jeanerette, LA  70544**
**(337) 276-6034**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Diamond Offshore Drilling**

**COOKS, Judge.**

This is an action to recover damages for personal injuries incurred by a seaman aboard an offshore drilling unit. Plaintiff sought recovery under the Jones Act, based on the negligence of plaintiff's employer, and under the general maritime law, based on the unseaworthiness of defendant's vessel. At issue is the correctness of the jury's verdict in favor of plaintiff finding the employer negligent and awarding damages to plaintiff in the sum of $630,000.00. For the following reasons, we affirm the jury's verdict.

## FACTS AND PROCEDURAL HISTORY

Plaintiff, Norman Mitchell, was employed by Diamond Offshore Drilling, Inc., as a member of a crew working on an offshore drilling unit, the OCEAN SARATOGA. On December 15, 1999, plaintiff alleged he was injured while using a sledgehammer to drive a bushing into a rotary table on the drill floor of the OCEAN SARATOGA.

Plaintiff filed suit against Diamond, under the Jones Act, contending the OCEAN SARATOGA was unseaworthy because the bushings, which were previously repaired six months earlier, did not fit properly into the rotary table. Thus, a sledgehammer was required to drive the bushings into place. Plaintiff asserted this violated several safety policies.

Following four days of testimony, the jury returned a verdict in favor of plaintiff finding Diamond was negligent. The jury denied plaintiff's claims against the OCEAN SARATOGA, finding the vessel was not unseaworthy. The jury awarded damages to plaintiff in the sum of $630,000.00. The trial court adopted the jury's verdict as its judgment. Diamond appealed the judgment, asserting the following assignments of error:

1.    The jury's finding that Diamond was negligent was manifestly erroneous.

2.    The trial court erred when it commented on the evidence during the jury charge and failed to allow adequate objection to the jury charge.

3.    The trial court failed to consider Diamond's Jury Verdict Questionnaire.

4.    The trial court erred in not including on the jury verdict questionnaire questions relating to the issues of causation, negligence and unseaworthiness.

5.    The trial court erred in using a visual aid while explaining certain jury interrogatories which contained hand-written damage amounts suggested by the plaintiff during closing argument, and which was brought into the jury room as part of the evidence.

## ANALYSIS

### I.    *Negligence on the Part of Diamond.*

The following analysis of what constitutes negligence under the Jones Act was recited by the Louisiana Supreme Court in *Foster v. Destin Trading Corp.*, 96-803, pp. 3-4 (La. 10/21/97), 700 So.2d 199, 208 (on rehearing):

> The Jones Act allows an injured seaman to bring a negligence suit against his employer. 46 U.S.C.App. § 688 (1994). The employer's potential liability extends to all personal injuries arising during the course of the seaman's employment, but proof of negligence is essential to recovery. *See Id.* Such negligence may arise in many ways including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care. *See Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 329 (5th Cir.1977); 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-21, at 312 (2d ed.1994). The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely the duty to take reasonable care under the circumstances. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335-36 (5th Cir.1997). The seaman bears the evidentiary burden of proving that a breach of the duty owed by the employer was a cause of his injuries. However, a seaman need only present "slight evidence" that his employer's negligence caused his injuries in order to reach the jury or to be sustained upon appellate review. *Id.* at 334-35. The employer can introduce evidence of the seaman's own negligence to reduce damages through application of pure comparative fault principles. Like his employer, the seaman must meet the standard of ordinary prudence by acting as a reasonable seaman would act under the

-2-

same circumstances. *Id*. at 339.

The manifest error-clearly wrong standard of review applies in Jones Act and general maritime cases. *Muhammad v. Diamond Offshore Co.*, 02-0172 (La.App. 3 Cir. 7/10/02), 822 So.2d 869, *writ denied*, 02-2409 (La. 11/27/02), 831 So.2d 279, *cert. denied*, 538 U.S. 1056, 123 S.Ct. 2215 (2003); *Ates v. Mallard Bay Drilling Inc.*, 01-836 (La.App. 3 Cir. 12/12/01), 801 So.2d 653, *writ denied*, 02-100 (La. 3/15/02), 811 So.2d 915.

After a thorough review of the record, we cannot say the jury erred in finding Jones Act negligence on the part of Diamond. The jury was well within its province as the factfinder to determine there was a long-standing problem with the insert bushings fitting into the master bushings. There was evidence this fit problem was not repaired promptly by Diamond, which instead relied upon its workers slamming the bushings into place with a sledgehammer. The record supported the jury's conclusion that this was a safety violation which constituted negligence on the part of Diamond.

Plaintiff testified the insert bushings did not seat properly when lowered into position by the Air Hoist. Plaintiff testified he and other crewmembers were ordered by their superiors to bang the insert bushings into place with a sixteen pound sledgehammer. Plaintiff stated he regularly complained to his superiors about the fit problem, but nothing was done. This problem lasted for a minimum of six months according to plaintiff. On December 15, 1999, plaintiff encountered difficulty getting an insert bushing to go down into the master bushing. He told his supervisor, John Hall, of the problem. Plaintiff stated Hall instructed him to beat on the bushing to get it down. According to plaintiff, he complied and used his sledgehammer to beat the first half of the bushing down, and while in the process of pounding on the second

half he felt a "shock" that went through his "arm and went down my right side, down my back and down to my leg."

Ryan Varnado was also a floorhand for Diamond at the time of the accident. On the date of his deposition, Varnado was still employed by Diamond. Varnado stated prior to and at the time of the accident, the insert bushing was not fitting properly into the master bushing. He was not positive as to the amount of time prior to the accident, but felt the fit problem began from the time the new master bushing was put in place aboard the drilling rig. The record established the new master bushing referred to was shipped to the OCEAN SARATOGA on March 24, 1999, over eight months prior to the accident. Varnado testified that the fit problem, after the new master bushing arrived, required use of a sledgehammer to pound the insert bushings into place. Often, Varnado stated, he was required to use a sledgehammer in this manner, and John Hall instructed him on numerous occasions to use a sledgehammer to hammer the insert bushings into place. Varnado witnessed plaintiff's accident, and heard him complain about back pain and pain going down his legs. Varnado stated plaintiff told him and other crew members his injury was caused by using the sledgehammer to pound in the insert bushings. Some time after plaintiff's accident, Varnado stated the fit problem was remedied and the crew was able to insert and remove the bushings simply by using the Air Hoist.

Donald Remson, a petroleum engineer, testified on behalf of plaintiff as an expert in petroleum engineering and safety. Remson concluded Diamond violated standards of the industry by having a malfunctioning piece of equipment (the master bushing) for a long period of time. While noting that it is not uncommon for a malfunction to occur, it should be fixed as soon as possible. He also found using a sledgehammer to pound on the bushings was a "very hazardous condition and it

should not be allowed. Supervision should not have allowed anybody to do that, much less encouraged somebody to do that."

Calvin Barnhill, Diamond's expert in petroleum engineering, reluctantly admitted that a fit problem occurring over a six month period was improper. He stated as follows:

> Q: My question was: I want you now to assume that it was a structural problem . . .
>
> A: Okay.
>
> Q: . . . where over a 6-month period where the bushings were not fitting properly and the driller required my client to use a sledge hammer to slam them in. Would that be a violation of the safety procedure?
>
> A: Again, as we talked about previously. . .
>
> Q: Wait. Could I get a "yes" or "no" and then an explanation?
>
> A: Okay. It depends on the nature of the problem. If it is a situation where it has to be driven into place, and there is a caveat with that and I would like to explain that, then to me, that bushing, that piece of equipment needs to be changed out. That would be an improper action and I think it would be a violation of safety.

Barnhill testified he took exception with plaintiff's claim that he used a sledgehammer in the manner stated. He felt if the fit problem was such that the bushings were out of "spec," the use of a sledgehammer would not be enough to drive the insert bushings into the master bushing. However, Barnhill noted he reviewed Ryan Varnado's deposition, who corroborated plaintiff's testimony that crew members aboard the OCEAN SARATOGA frequently were required to use sledgehammers to fit the bushings. When asked to assume their testimony as accurate, Barnhill reiterated that not fixing the fit problem for months was a safety violation.

Bobby Adams, who was in charge of the OCEAN SARATOGA, testified there was a problem for six months, but the bushings could be fitted simply by lightly

tapping them into place with a sledgehammer rather than slinging the sledgehammer. Hayes remembered a short time after the accident, a pair of bushings were sent in for repairs. Plaintiff presented a copy of a repair ticket for "bowl – insert #3" which stated "Present bowl is too tight. Will not seat properly." Adams acknowledged that if the bushings are broken, the policy was not to slam them into place with a sledgehammer, but to get them fixed.

After reviewing the record in its entirety, we cannot say the jury manifestly erred in finding Jones Act liability on the part of Diamond. Differing views of the evidence were presented to the jury with regard to the negligence of Diamond in causing plaintiff's back and neck injury. Plaintiff testified he was ordered by his supervisor to slam insert bushings into place to fix a long-standing fit problem that the employer was aware of and had not remedied. Plaintiff's testimony was corroborated by other witnesses. Expert testimony established not fixing the fit problem and requiring crew members to use sledgehammers in this manner were safety violations. We cannot say the jury was unreasonable in finding liability on the part of Diamond.

## II.    *Comments on the Evidence.*

Diamond also contended the trial court commented inappropriately on the evidence during the jury charge.

La.Code Civ. P. art. 1791 provides:

> The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted.

Even when a trial judge violates the prohibition against commentary on the evidence, it does not automatically require reversal of the jury verdict. Reversal is only mandated where the record as a whole reveals the inappropriate comments were

so prejudicial that the complaining party was denied a fair trial. *Dixon v. Winn-Dixie Louisiana, Inc.*, 93-1627 (La.App. 4 Cir. 5/17/94), 638 So.2d 306.

Diamond argues in brief the trial court's comments expressed an opinion to the jury as to how they should decide this case. Diamond cites numerous examples of statements made by the trial court during the jury charge that were inappropriate and were "sufficient to deny adequate and meaningful jury deliberations." Initially, it argues the trial court removed the decision of the causal relationship between the back surgery and the neck surgery from the jury by commenting that there was a causal relationship between the back and neck injuries. Our review of the jury charge shows this argument to be meritless. The trial court at the beginning of its charge, noted there was no question that plaintiff underwent back surgery as well as neck surgery, and that both doctors agreed that the surgeries were necessary. The trial court did not state that both injuries were related, but simply stated that plaintiff suffered both a back injury and a neck injury for which surgery was required. The court then stated to the jury "[W]hat you are asked to decide is whether Diamond Offshore Drilling was at fault in any way in causing the injury so that Mr. Mitchell would be entitled to money damages."

Diamond also argues the trial court erred in specifically mentioning the names of two witnesses, the plaintiff and Mr.Varnado, because in specifically mentioning them, it "is directing the jurors to pay particular attention to their testimony." We find this argument baseless. When the trial court referred by name to plaintiff and Mr. Varnado, it made no reference to the content of their testimony, but simply noted these two witnesses were eyewitnesses. Immediately after its reference to the two witnesses, the trial court told the jury it was "to consider all of the evidence."

Next, Diamond argues that the trial court called "attention to specific evidence

. . . when [it] mentions the 'defective part' when referring to the testimony about the bushing involved in this incident." Diamond, in its brief, cites us to this alleged commentary by the court, and argues its comment "again steers" the jury toward a conclusion that the bushings were defective and denied the jury meaningful deliberations. We have read the cited passage, and finds Diamond's characterization of the trial court's comments to be a blatant misrepresentation. The trial court stated as follows:

> Now if there was no negligence and we were only talking about a defective part for unseaworthiness, he would have to prove that it is more likely so than not that his injuries were caused. But in this case you have both claims, negligence and unseaworthiness; and in the context of this case, they are more or less the same. If Diamond Offshore was at fault for having a defective part, then that is negligence. If the part was defective then that is unseaworthiness. So it is 6 of one half dozen of this other in this particular case. It is not always that way.

At no point did the trial court infer that the bushings were defective, but rather the court properly stated the different scenarios *if* the bushings were found to be defective.

Diamond next argues the trial court "directs the jurors to the record for the charges of Dr. Elias and states that there is 'supposedly proof in the record' of the charge." Then, it is argued, the trial court directed the jurors' attention to the figures provided by the economist as a point of reference for past-lost wages. Diamond insists this "direction by the court emphasizes how the court believes that the jurors should decide the case thus interfering with the ability of the jurors to adequate jury deliberations." The following passages are cited by Diamond in support of this argument:

> For the past loss of medical expenses, there is supposedly proof in the record that you can look at to determine how much Dr. Elias charged after the Plaintiff was discharged from Dr. Cobb. But you don't have to worry about past medical expenses for Dr. Cobb or Dr. Cenac or any of the hospitals or physical therapists because Diamond Offshore

had already paid all of that. So that is not an issue.

On past loss of wages, Diamond Offshore did pay the man some of his wages in addition to the maintenance. And if you find that he is entitled to recover the figure given by the economist who testified, he has already deducted that credit. So if you find that he is entitled to past loss of income, then you can, but you don't have to use the figure that the economist gave you for the past loss of wages because the amount Diamond Offshore has paid has already been subtracted from this.

. . . .

And then there is an award for future loss of earnings and loss of earning capacity. And again, Mr. Mitchell is claiming that he is not able to go back to work in the oilfield and therefore has a future loss of earnings; and because of his disability, he has a future loss of earning capacity. You can be guided, but you are not obligated to use the figures by the economist in making that award. You can make whatever award you feel is proper. The economist did testify that – The evidence that went in to the record rather, does indicate that the parties agreed on a 5.3 work life expectancy or something like that, and those figures were calculated based on that. In one set of figures, the economist assumed that the man wouldn't go back to work at all; and on the other set of figures, he calculated that the man would go back to work on a minimum wage type job.

Diamond, however, did not include the following portion of the trial court's comments to the jury:

Now by me telling you this, I am not suggesting to you that you have to award damages for past loss of wages. You might find that they are not due. But if you find that they are due, then that can be considered by you.

. . . .

So it is up to you to decide what figure to use, or you can use your own figures. Or you can find it wasn't proven. If you find it wasn't proven, then you shouldn't award any for past – I mean for future loss of earnings.

We find nothing in the record to indicate the trial court attempted to "steer" the jury towards a certain verdict. Further, we note the jury awarded lower amounts than that requested by plaintiff, and Diamond did not appeal as excessive the amounts awarded by the jury.

Even assuming the trial judge may have committed a "borderline" error in

commenting upon the testimony in the manner in which he did, upon our review of the record, we find the comments did not deny the jury adequate and meaningful deliberations or deprive Diamond of a fair trial.

### III.    *Jury Verdict Questionnaire.*

Diamond argues the trial court erred in not including on the jury verdict questionnaire separate questions relating to the issues of causation, negligence and unseaworthiness.  Diamond objected to the jury verdict questionnaire at trial and the trial court gave the following reasons for overruling said objection:

> Yes sir.  Let me, let me rule on that.  The objection was over-ruled and I stated the reasons for over-ruling the objection.  Basically the Court feels that to require the Jury to make a finding on each injury that the Plaintiff received in a particular accident is a highly unusual type of procedure.  The Court adequately explained to the Jury that, if the Jury didn't feel the neck injury was related, they could adequately cover that in their damage award to the Plaintiff.  Since past medicals are not in dispute, since there is no issue of separate medical bills for the neck as opposed to the back, then that, to me, to the Court, was a much more appropriate way for the jury to address the issue of whether the neck is related than in a separate interrogatory.  And we did that.  We did explain to the Jury that they can be taken into account by them.

Diamond, in its brief, states the trial court "allude[d] to the fact that the court believes that the neck injury is caused by the same incident that caused the back injury."  We have thoroughly reviewed the trial court's instructions to the jury, and the record simply does not indicate the trial judge suggested or expressed a belief that the neck injury was related to the back injury.  That decision was left solely to the determination of the jury.

### IV.    *Jury Charge.*

Diamond also argues on appeal the trial judge erred in failing to give a charge on any possible intervening cause or on comparative fault.  When Diamond made the same complaint below, the trial judge specifically noted and we agree "there was no evidence whatsoever in the record, nor was there any evidence even alluded to that

there was any intervening cause." A trial judge is not required to give a charge unless the facts support the giving of the charge. *McCrea v. Petroleum, Inc.*, 96-1962 (La.App. 1 Cir. 12/29/97), 705 So.2d 787. The trial judge also explained while he did not give a formal charge on comparative fault, he "did adequately instruct the Jury on how to consider comparative fault on the part of Mr. Mitchell, how to assign the percentage, etc." Thus, we find no merit in this argument.

Diamond also notes that during deliberations the jury requested a copy of "the Jones Act basic rules and Seaman rules as read to us prior to deliberation." The trial judge informed the jury that these "basic rules" were not "anything that [he] read," but rather were given from memory in a "general presentation" to summarize the Jones Act rules before they were read to the jury. Diamond, citing La.Code Civ.P. art. 1793D (which requires that the jury may take with it or have sent in a written copy of all instructions and charges), complains the jury could not be provided with the same instructions and charges because the summarization in the beginning was not written. This, Diamond argues, was an "attempt to circumvent the requirement to give the jury written charges during deliberations as required." We disagree.

The trial judge, in response to the jury's request, attempted to repeat his "general presentation," and also provided the jury with the actual Jones Act and unseaworthiness rules. There is nothing in the record to indicate the jury was not correctly instructed on the law. Further, the record does not support a finding that the jury could not properly deliberate and render a judgment in this case because the written instructions actually provided to it were inadequate or in conflict with the oral summation given to it by the judge.

## IV. *Visual Aid.*

Diamond argues the trial judge committed reversible error in relying on

plaintiff's visual aid to help explain the jury interrogatories. Following closing arguments, the trial judge came down from the bench, approached the jury box and stood next to plaintiff's visual aid, which was a blow-up of the jury interrogatories. The trial judge then attempted to explain the jury interrogatories to the jury, and referenced the blown-up copy on plaintiff's visual aid to facilitate his explanation. Diamond complains the visual aid also displayed amounts inserted by plaintiff into the blanks following the interrogatory relating to the award of damages. The trial judge informed the jury it was not to consider the amounts in the blanks on the visual aid. After the jury retired to the jury room for deliberations, Diamond objected to the use of the visual aid, stating its use was prejudicial to it. The trial judge responded to the objection as follows:

> I appreciate that, but had the objection been timely made, I could have considered it. Unfortunately, the objection wasn't made and I did use the blow-up of the Jury Instructions that the Court had prepared to simply demonstrate to the jurors what the questions on their Jury Interrogatories were going to be. And I did go to great pains to tell them to forget about the blanks that had been filled in by the Plaintiff, and I also covered the damage portion of the Interrogatories as I showed the jurors how to go about answering the questions. So even after the fact, I don't feel that another admonition to the jury is warranted, even at this late date, because I feel that I adequately admonished them not to place any weight on the fact that I was using the Plaintiff's blow-up of my Jury Questions to demonstrate to them how to answer, and I took pains to cover the damage portion and explain to the jurors more than once that they were not expected to award damages at all. And if they did, they were to award damages that they felt were reasonable. I think overall the instructions were fair to all sides, and the Court will over-rule the objection.

We find Diamond suffered no prejudice by the trial court's use of the visual aid. The trial court appropriately instructed the jury it was not to place any weight on the use of the visual aid or the amounts located in the blanks. As plaintiff points out, the jury's award did not match any of the amounts found on the visual aid. Further, the jury awarded less than half the total amount requested by plaintiff and did not find in

plaintiff's favor on the issue of seaworthiness.

Diamond also complains that the visual aid, which was not introduced into evidence, was taken back to the jury room when deliberations began. Shortly after the jury retired, the trial judge personally retrieved the visual aid. Diamond objected to the presence of the visual aid, and the trial judge asked if it were sure it wanted to object, because the visual aid was "laying up against the hall, hidden behind all of the other posters." Diamond withdrew its objection when it was assured by the trial judge that it was not seen by the jury. There is no merit to Diamond's argument on appeal that it was prejudiced by the visual aid being briefly taken to the jury room. Further, Diamond's decision to withdraw its contemporaneous objection prevents it from re-urging it on appeal.

## DECREE

For the foregoing reasons, the judgment is affirmed. All costs of this appeal are assessed to appellant, Diamond Offshore Drilling, Inc.

**AFFIRMED.**

-13-