15-1113 consolidated with 15-354 & 15-838

RON WARREN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DEREK HEBERT

VERSUS

SHELTER MUTUAL INSURANCE COMPANY, ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2006-385
HONORABLE DAVID KENT SAVOIE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters, and John E. Conery, Judges.

CONERY, J., concurs in part, dissents in part and assigns reasons.

AFFIRMED.

Anthony M. Fazzio
4906 Ambassador Caffery – Suite 1000
Lafayette, LA 70508
Telephone: (337) 406-1122
COUNSEL FOR:
    Plaintiff/Appellee - Ron Warren, Individually and on Behalf of the Estate of Derek Hebert

Barton W. Bernard
117 Caillouet Place
Lafayette, LA 70501
Telephone: (337) 989-2278
COUNSEL FOR:
    Plaintiff/Appellee - Ron Warren, Individually and on Behalf of the Estate of Derek Hebert

**Steven Broussard**
**Steven R. Hart**
**Aaron Broussard**
**Broussard & Hart, LLC**
**1301 Common Street**
**Lake Charles, LA 70601**
**Telephone: (337) 439-2450**
**COUNSEL FOR:**
> **Plaintiff/Appellee - Ron Warren, Individually and on Behalf of the Estate of Derek Hebert**

**David R. Frohn**
**Manion Gaynor & Manning LLP**
**2201 Lake Street - Suite 106**
**Lake Charles, LA 70601**
**Telephone: (337) 419-1929**
**COUNSEL FOR:**
> **Defendant/Appellant - Teleflex, Inc.**

**H. Alston Johnson, III**
**Phelps Dunbar LLP**
**II City Plaza**
**400 Convention Street - Suite 1100**
**Baton Rouge, LA 70802**
**Telephone: (225) 346-0285**
**COUNSEL FOR:**
> **Defendant/Appellant - Teleflex, Inc.**

**Jeffery D. Fruge**
**The Thibodeaux Law Firm, LLC**
**P. O. Box 2090**
**Lake Charles, LA 70602-2090**
**Telephone: (337) 433-5523**
**COUNSEL FOR:**
> **Defendant/Appellant - Teleflex, Inc.**

**Rudie R. Soileau, Jr.**
**Lundy, Lundy, Soileau & South, LLP**
**P. O. Box 3010**
**Lake Charles, LA 70602**
**Telephone: (337) 439-0707**
**COUNSEL FOR:**
> **Defendant/Appellee - Glen D. Vamvoras**

**Richard D. Chappuis, Jr.**
**Voorhies & Labbe**
**P. O. Box 3527**
**Lafayette, LA 70502**
**Telephone: (337) 232-9700**
**COUNSEL FOR:**
**Defendant/Appellee - Bowtie Marina**

**Maurice L. Tynes**
**Maurice L. Tynes & Associates**
**4839 Ihles Road**
**Lake Charles, LA 70605**
**Telephone: (337) 479-1173**
**COUNSEL FOR:**
**Defendant/Appellee - Daniel Vamvoras**

**Vernon Ed McGuire, III**
**Plauche', Smith & Nieset**
**P. O. Drawer 1705**
**Lake Charles, LA 70602**
**Telephone: (337) 436-0522**
**COUNSEL FOR:**
**Defendants/Appellees - Richard Gandy, Michael Torres, Progressive Security Insurance Company, and Logan Gandy**

**James Ryan, III**
**James Ryan III & Associates, LLC**
**201 St. Charles Avenue – Suite 2420**
**New Orleans, LA 70170**
**Telephone: (504) 599-5990**
**COUNSEL FOR:**
**Defendant/Appellant – Harold Dyke d/b/a Harold's Marine**

**Joshua S. Force**
**Kevin M. McGlone**
**Sher Garner Cahill Richter Klein & Hilbert, L.L.C.**
**909 Poydras Street – Suite 2800**
**New Orleans, LA 70112**
**Telephone: (504) 299-2100**
**COUNSEL FOR OTHER:**
**National Marine Manufacturers Association**

**Francis P. Manchisi**
**Wilson Elser Moskowitz Edelman & Dicker LLP**
**1133 Westchester Avenue**
**White Plains, NY 10604**
**Telephone: (914) 872-7000**
**COUNSEL FOR OTHER:**
**National Marine Manufacturers Association**

**Iain L. Kennedy**
**Shook, Hardy & Bacon L.L.P.**
**Miami Center - Suite 3200**
**201 S. Biscayne Boulevard**
**Miami, FL 33131-4332**
**Telephone:  (305) 358-5171**
**COUNSEL FOR OTHER:**
     **Louisiana Association of Business and Industry**

**Mark A. Behrens**
**Cary Silverman**
**Shook, Hardy & Bacon L.L.P.**
**1155 F Street NW – Suite 200**
**Washington, DC 20004**
**Telephone:  (202) 783-8400**
**COUNSEL FOR OTHER:**
     **Louisiana Association of Business and Industry**

**THIBODEAUX, Chief Judge.**

For the reasons discussed in the consolidated case of *Warren v. Shelter Mutual Insurance Company, et al.*, 15-354 (La.App. 3 Cir. ___/___/___); ____ So.3d ____, the judgments of the trial court are affirmed in all respects.

All costs are assessed to Teleflex, Inc.

**AFFIRMED.**

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

RON WARREN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DEREK HEBERT

VERSUS

SHELTER MUTUAL INSURANCE COMPANY, ET AL.

**CONERY, J., concurs in part, dissents in part, and assigns reasons.**

I respectfully dissent from the majority's decision to affirm the trial court's ruling to grant a new trial from the first jury verdict in favor of Teleflex. I would reverse and render judgment in favor of Teleflex, dismissing all of plaintiff's claims with prejudice at his cost. This decision renders moot all remaining assignments of error. There are three separate appeals consolidated and considered together. I will discuss only the appeal in docket number 15-1113 alleging trial court error by granting a new trial from the first jury verdict finding for Teleflex and resulting in a judgment dated September 30, 2014, in its favor, dismissing all plaintiff's claims with prejudice and at plaintiff's cost, which I would propose to reinstate.

Should the trial court's and majority decision become final, I concur only with the majority decision in docket number 15-838 to affirm the trial court's decision to award prejudgment interest on compensatory damages and deny prejudgment interest on punitive damages.

# ASSIGNMENT OF ERROR NO. 2

## NEW TRIAL

Louisiana code of Civil Procedure Articles 1972 and 1973 set forth the basis upon which a new trial can be ordered.[1] None of the mandatory grounds found in La.Code Civ.P. art. 1972 apply here. The trial judge articulated that he granted a new trial in this case under the discretionary grounds found in La.Code Civ.P. art. 1973 in order to prevent a "miscarriage of justice."

The majority accurately quotes *Lamb v. Lamb*, 430 So.2d 51 (La.1983), as to the law generally applicable to the issue of the grant of a new trial. However, where, as here, the jury heard all of the evidence, significant weight must be given to the jury's decision. In *Lamb*, the supreme court set forth the well-settled standard for granting a new trial and emphasized the need to examine all of the "facts and circumstances of the individual case".

> [Louisiana Code of Civil Procedure Article] 1973 provides that the trial court may grant a new trial if there exists good grounds therefor. A proper application of this article **necessitates an examination of the facts and circumstances of the individual case. When the trial judge is convinced by his examination of the facts** that the judgment would result in a miscarriage of justice, a new trial should be ordered. *Deliberto v. Deliberto*, 400 So.2d 1096 (La.App.

---

[1]Louisiana Code of Civil Procedure Article 1972 provides:

A new trial shall be granted, upon contradictory motion of any party, in the following cases:

(1) When the verdict or judgment appears clearly contrary to the law and the evidence.

(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.

(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.

Louisiana Code of Civil Procedure Article 1973 provides, "A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law."

1st Cir.1981); *Jones v. Ledet*, 383 So.2d 1308 (La.App. 3rd Cir.1980); *Shows v. Williamson*, 256 So.2d 688 (La.App. 2nd Cir.1972); *See Hardy v. Kidder*, 292 So.2d 575 (La.1973); *Succession of Robinson*, 186 La. 389, 172 So. 429 (1936).

(Emphasis added.)

Further, the first circuit has more recently stated, "the discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict." *Burris v. Walmart Stores, Inc.*, 94-0921 (La.App. 1 Cir. 3/3/95), 652 So.2d 558, 560, *writ denied*, 95-0858 (La. 5/12/95), 654 So.2d 352. The reviewing court must balance the great deference given to the jury's fact-finding role and the discretion of the trial judge in deciding whether to grant a new trial from a favorable jury verdict. *See Davis v. Wal-Mart Stores, Inc.*, 00-445 (La. 11/28/00), 774 So.2d 84. In doing so, "The scales are clearly tilted in favor of the survival of the jury's verdict, but the trial court is left with a breadth of discretion which varies with the facts and events of each case." *Id*. at 94. "**The trial record must be examined carefully** to determine if the trial court abused its discretion in deciding that the jury verdict was not supportable by '**any fair interpretation of the evidence**.'" *Campbell v. Tork, Inc.*, 03-1341, p. 5 (La. 2/20/04), 870 So.2d 968, 971 (emphasis added) (citing *Id.*).

In *Campbell v. Tork*, 870 So.2d at 971 (footnotes omitted), our supreme court articulated the standard of review to be used by an appellate court in reviewing a trial court ruling on a motion for new trial:

> The applicable standard of review in ruling on a motion for new trial is whether the trial court abused its discretion. *Martin*[ *v. Heritage Manor South Nursing Home*, []00-1023 (La.4/3/01), 784 So.2d 627, [632]]. In order to apply this standard, "we are faced with the balancing of two very important concepts: the great deference given to the jury in its fact[-]finding role and the great discretion

given to the trial court in deciding whether to grant a new trial." *Davis*, [] 774 So.2d. at 93-94. Though the "[trial] court has much discretion [in determining whether to grant a new trial], this [c]ourt will not hesitate to set aside the ruling of the trial judge in a case of manifest abuse." *Lamb v. Lamb* 430 So.2d 51 (1983). Thus, although "the scales are clearly titled in favor of the survival of the jury's verdict, the trial court is left with a breadth of discretion which varies with the facts and events of each case." *Davis*, [] 774 So.2d at 94.

Although our standard of review is relatively straight-forward, the application of this standard is more complicated. *Martin*, [] at 632. In order to enable this Court to correctly apply this standard of review, the facts and evidence presented in each case are very important. The trial record must be examined carefully to determine if the trial court abused its discretion in deciding that the jury verdict was not supportable by "any fair interpretation of the evidence." Thus, the evidence and testimony is hereafter examined in order to correctly apply our standard of review.

Thus, it is clear that it is the duty of the trial judge to review **all of the evidence** before making a decision to grant a new trial and only if the trial court finds that the jury's verdict was not supportable by any fair interpretation of the record as a whole may a new trial be granted.

In *Davis v. Wal-Mart*, our supreme court found that the "jury's verdict was supportable by a fair interpretation of the evidence" and found no good grounds for the grant of a new trial. *Id.* at 95. The court stated:

The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. **The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility.** A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. **Thus, the jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence.**

*Id.* at 93 (emphasis added) (citations omitted).

In *Davis v. Witt*, 02-3102, p. 23 (La. 7/2/03), 851 So.2d 1119, 1134 (emphasis added), the supreme court quoted *Davis v. Walmart* throughout and reversed the trial court's grant of a new trial and reinstated the jury verdict. Finding that the evidence fully supported the jury's verdict, the supreme court stated:

> **When any fair interpretation of the evidence supports the jury's verdict, the grant of a new trial must be reversed. - - - "It is well accepted a party may not assign as error the giving or the failure to give a jury instruction unless he objected at trial**. . . . As such, we have said that the failure to object to the inclusion of a jury charge precludes a party from raising a claim[.]

Our court has further stated that "the requirement of a **simultaneous objection** would be meaningless if a party could reserve the right to register an objection until after an adverse verdict." *Pitard v. Davis*, 599 So.2d 398 (La.App. 5 Cir. 1992) (emphasis added) (citing *Mobley v. General Motors Corp.*, 482 So.2d 1056, 1061 (La.App. 3[] Cir. 1986), *writ denied*, 486 So.2d 735 (La.1986).

In *Johnson v. H.W. Parson Motors, Inc.*, 231 So.2d 73, 79 (La.App. 1 Cir. 1970), counsel did not object to the trial court making a comment about the characterization of a witness in the presence of the jury. The first circuit stated:

> We also note that no effort was made by counsel for appellants either at that stage of the trial or in conjunction with the trial court's charging of the jury to bring this matter to the attention of the trial court so that the jury could be expressly admonished to disregard the comment. We feel counsel for appellants should have made his objection before the trial court or if he felt the statement so prejudicial, he should have moved for a mistrial; instead, counsel for appellants was willing to permit the jury to consider the case and only after appellants have received an unfavorable verdict and judgment is this error urged as a basis for reversal and a new trial. We feel under the circumstances appellants waived the objection and cannot now be heard to complain[.]

The recent Louisiana Supreme Court decision in *Logan v. Schwab*, 15-1508 (La. 5/27/16), _____ So.3d _____, is instructive on this issue. The majority per

curiam opinion granted plaintiff a new trial because of a "miscarriage of justice" caused by the outrageous behavior of the trial judge as described in detail by Chief Justice Johnson in her concurrence. The majority stated "Considering the unique and narrow facts presented, we conclude a new trial must be granted." Three justices dissented. The dissents pointed out that the behavior of the trial judge, however outrageous, had not been properly documented in the record and no contemporaneous objection was made as to the judge's behavior during the trial:

> This examination required by law must be based on evidence, not conjecture, and begins with the trial record. In the trial record, there is nothing to substantiate the plaintiffs' allegations of inappropriate behavior. Most significantly, there is not even an objection in the trial record for any of the allegations leveled against the judge. This court has previously found that the lack of a contemporaneous objection about a judge's conduct reveals a lack of prejudice.

> . . . .

> However, the law also contains the counsel of great care and caution in resorting to a juror's impressions. Specifically and directly, [La.Code Evid.] art. 606(B) limits a juror's testimony to "whether any outside influence was improperly brought to bear upon any juror" and prohibits testimony as to the "effect of anything upon his or any other juror's mind or emotions as influencing him" or "concerning his mental processes" as to reaching a verdict.

> . . . .

> As this court previously recognized, there are two rationales behind the contemporaneous objection rule: "(1) to put the trial judge on notice of the alleged irregularity so that he may cure the problem and (2) to prevent a defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by objection." *State v. Thomas*, 427 So.2d 428, 433 (La.1982) (on reh'g). **A party should not be entitled to stash an objection in his back pocket and sit on it, only to pull it out after an adverse judgment.**

*Id.* at pp. 2-3 (emphasis added). Though contained in the dissents, the points of law at issue accurately quote settled jurisprudence.

In *Mitchell v. Diamond Offshore Drilling, Inc.*, 05-396, pp. 9-10 (La.App. 3 Cir. 11/2/05), 916 So.2d 465, 472, our court stated, "Even assuming the trial judge may have committed a 'borderline' error in commenting upon the testimony in the manner in which he did, upon our review of the record, we find the comments did not deny the jury adequate and meaningful deliberations or deprive [defendant] of a fair trial."

The supreme court, in a recent decision authored by Justice Knoll dealing with the manifest error rule had this to say about the duty of a reviewing court when considering whether to overturn a jury verdict: "The issue to be resolved on review is not whether the judge or jury was right or wrong, but whether the judge's or jury's factfinding conclusion was a reasonable one." *Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC*, 14-2592, p. 4 (La. 12/8/15), ___ So.3d ___. Further, the court stated:

> Rather in reversing a trial court's factual conclusions with regard to causation, the appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. *Stobart v. State through Dept. of Transp. and Development*, 617 So.2d 880, 882 (La. 1993).

> This test requires a reviewing court to do more than simply review the record for some evidence, which supports or controverts the trial court's findings. The court must review the entire record to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *Parish Nat. Bank v. Ott*, 02-1562, pp. 7-8 (La. 2/25/03), 841 So.2d 749, 753-54. The issue to be resolved on review is not whether the judge or jury was right or wrong, but whether the judge's or jury's factfinding conclusion was a reasonable one. *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989); *Canter v. Koehring Co.*, 283 So.2d 716, 724 (La.1973).

> Notably, reasonable persons frequently can and do disagree regarding causation in particular cases. But where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Rosell*, 549 So.2d at 844.

*Id*. at pp. 4-5.

In reviewing the jury's verdict and deciding whether to grant a new trial, the trial judge in this case had an even greater standard. He is not to overturn the jury's verdict when **any** fair interpretation of the evidence would support it.

In this case, the only grounds for the motion for new trial was the claim that the trial judge, in response to a jury question, and after consulting with all the attorneys, mistakenly gave inaccurate information to the jury about the effective date of an owner's manual for the steering system in question. In effect, the allegation is that because the trial judge, without objection, and in fact, by agreement of all counsel, inaccurately commented upon or added to the evidence already in the record in violation of the prohibition against a judge commenting upon or attempting to recapitulate the evidence in a jury trial contrary to La.Code Civ.P. art. 1791,[2] there was a "miscarriage of justice" under the discretionary grounds of La.Code Civ.P. art. 1973 such that a new trial should be ordered.

The record shows the following occurred:[3]

> (Whereupon the jury returns to the courtroom.)
>
> THE COURT:
>
> You asked two things. You asked for photographs. We're going to send you with two photographs. Okay? And you said manuals. We didn't know which ones you wanted, or you wanted all

---

[2]Louisiana Code of Civil Procedure Article 1791 provides: "The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted."

[3]The exhibits mentioned throughout this opinion will be identified as follows:

P-2 Photo of Boat Pump
P-5 Photo of Cylinder Warning
P-22 Warning Sign (Cylinder)
P-23 Warning Sign (Pump)
P-24 SeaStar Manual for Outboard

three:

JURY FOREMAN:

The copy of the two - - or the manuals that came with the - -

THE COURT:

I got a manual on SeaStar, a manual the Champion boat, and a manual on the OMC motor.

JUROR:

We want the manual for the helm cylinder, that - - the steering one.

THE COURT:

SeaStar.

JUROR:

Yeah.

THE COURT:

Okay.

JURY FOREMAN:

And the pictures of it too.

THE COURT:

Got it.  This is **"P-5".**  That's what you wanted?  And **"P-2".**

Okay.  The bailiff will bring it back to you in the courtroom (sic).

THE CLERK:

**"P-24."**

THE COURT:

"**P-24**" is the one they've got, the SeaStar manual.

(Whereupon the jury exists the courtroom to deliberate.)

(Whereupon the jury returns to the courtroom.)

THE COURT:

Okay. My appreciation of the question is; "Is this the '97 SeaStar manual that would have been in the boat available in 1998?" That's my understanding of that.

Were you looking at this to give you the 2006?

The back of it says was revised in 2006.

JURY FOREMAN:

The back of it says was revised in 2006.

THE COURT:

I don't see that he's talking about.

(Whereupon the juror approaches to point it out.)

JURY FOREMAN:

It says, "0706 Rev." at the bottom. Or is that maybe just a code, or . . .

THE COURT:

Okay. Come see.

Form number - - it's - - no, that's just a - - that's probably just a code. What they were looking for here - - see, '07, '06.

MR. FROHN:

That's just printer's code of some kind.

THE COURT:

That's not a revision date:

MR. FROHN:

No, that's a - - that's got to be a printer's code - -

THE COURT:

No. **This is what purports to be the manual that was available, or that was produced in connection with the device that was in the boat.** Yeah.

(Emphasis added.)

The manual in question, introduced by plaintiff and identified as P-24, was the only steering system manual in evidence. Arguably, when the question arose, the judge should have simply instructed the jurors that they must rely on their memory of the witness testimony as to the date and relevance of the manual. Instead, the trial judge called the lawyers to the bench for a bench conference. The trial record confirms that plaintiff's counsel was at the very depositions at which the experts testified as to when the applicable manuals were printed and when they were revised. Most importantly, at the moment the jury asked the question and the court answered it **after consulting with both attorneys**, **there was no contemporaneous objection made by plaintiff's counsel** when the judge asked the attorneys what answer to give the jury. When the judge did answer the question, Teleflex's attorney and the trial judge were wrong about the effective date of the manual, but since that manual was the **only manual** in evidence that pertained to the steering system, the full answer given by the trial judge, as noted above, was factually correct. This was the manual (the only manual in evidence) that pertained to the steering system, regardless of the date.

Plaintiff's counsel, Mr. Bernard, alleged in the motion for new trial filed with the trial court that co-counsel, Mr. Fazzio, "handled that part of the case," and was not in the courtroom when the jury's question arose. However, the attorney in question, Mr. Fazzio, stated the following on the record at the motion for new trial:

> When I come in Mr. Dewees (the jury foreman) and other are walking through the door and apparently somebody was focused on

that date stamp. Mr. Dewees walks to the jury box - - - and he shows the Court what it is he's looking at. I'm standing back at counsel table and I'm watch this go on and then Mr. Frohn says to the - - to the jury or says in front of the jury, "It's a printer's code."

Though Mr. Fazzio may not have been in court when the jury first came in and asked about the manual, clearly, Mr. Fazzio was in court and able to object before the jury went back in to deliberate.

In this case, it was plaintiff's burden to prove that a new trial was warranted. In that connection, it is especially difficult to discern what effect, if any, the answer to the jury's question may have had on the jury's decision. Any effort to delve into the minds of the jurors post trial would be prohibited by the Louisiana Code of Evidence. Indeed, La.Code Evid. art. 606(B) states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

The record further reflects that immediately after the trial judge answered the jury's question, with no objection from plaintiff's counsel, the judge had second thoughts about whether he was improperly commenting on the evidence and he specifically addressed the attorneys:

THE COURT:

Do you have (any) objection to my response to them.

MR. FROHN:

None whatsoever.

MR. BERNARD:

None for the plaintiff either.

THE COURT:

It came close to commenting on the evidence and telling them what it was, but I got the impression the testimony said that this was the manual that went with the thing; is what the testimony was, right? Okay. (No response.)

(Whereupon the jury exits the courtroom to deliberate.)

Again, plaintiff's counsel did not object while there was still time to correct any perceived error. Mr. Fazzio, the attorney who handled the questioning of Mr. Killingsworth and all of the experts as to the manual, was at counsel table. At that point, had there been an objection, the judge could have simply instructed the jurors to rely on their memories and judgment as to what plaintiff's own exhibit meant and whether the effective date of that "manual revision" was relevant.

The very notion that the trial judge informing the jury by agreement of all counsel that the wrong revision date on plaintiff's own exhibit can then be used to establish a "miscarriage of justice" warranting a new trial is especially contradicted where, as here, the testimony at trial was that neither the boat owner or operator had ever received or read **any** manual on the hydraulic steering system. Plaintiff's own expert, Stephen Killingsworth said of the relevance of the manual:

> Q. You talked about this manual - - well, let's start kind of backwards here. The manual that we now have into evidence, just to be sure of what it is entitled, it is entitled not only installation instructions, but it is an owner's manual, correct?
>
> A. That's correct.
>
> Q. And you've been around this case long enough to know that this [P-24] is the manual that the Vamvoras family did not get when they bought the boat?

A.    That's what I understood.

Q.    Okay.  So, for all your quarreling with the manual, it doesn't matter because they didn't have it to read anyway.

A.    I don't know if that's a question.

Q.    I'm sorry.  Isn't it true that they didn't have it in the first instance to even refer to if they so chose?

A.    That's correct.  But the manual - - when I take on a task and look at this I look at – they may not have had access to it, but I look at the population, and it's been discussed by Mr. Fetchko in regard to it, we've got to take into account the entire population.  The entire population would have been using that - - that purchased the helm and the other information.

Q.    Well, this is not a - -

A.    Well, I know.  What I'm saying is that I'm not just singling out Mr. Vamvoras.  I'm simply saying, as a writer of manuals, writer of warning, as a designer, I would have expected that information to be there, period.

Q.    **Okay.  But isn't it logical that, no matter how much you quarrel with the manual, if the person who is supposed to get it didn't get it, it's sort of immaterial to a particular case?**

A.    **That I'll agree to.**

(Emphasis added.)

The adequacy of the warnings in the Teleflex manual was never at issue.  In *Bloxom v. Bloxom*, 512 So.2d 839, 850-51 (La.1987),[4] the Louisiana Supreme Court had this to say about adequate warnings in an owner's manual, "Accordingly, even if an adequate warning of the particular danger in this case had been given by a proper provision in the manual, such a warning would have been futile because Lonnie Bloxom did not read the manual before parking his car over combustible materials."

In fact, during this trial counsel for plaintiff attempted to question Mr. Glen Vamvoras about warnings in general, which would include any warnings that may have appeared in the Teleflex steering system manual.

Q.     All right.  Let's suppose you had had a warning that said, "Be careful of leaks, because the leak can put the system in trouble." Would you have let your son take the boat if Derek had told you he saw leaking?

MR. FROHN:

Your Honor, I object to the question that it's now been established he did not receive a manual, he did not receive any --

THE COURT:

Objection.  Sustained.

The trial judge recognized that warnings in the manual were irrelevant and quickly sustained the objection.

In a motion for new trial, the burden remains on the mover.  Here, there was no evidence introduced at the new trial motion as to how the erroneous answer to the jury's question may have possibly influenced the jury's verdict, much less proof of a "miscarriage of justice."  No affidavits, no testimony from an expert or even from plaintiff's counsel – NOTHING!  There definitely was no showing of a "miscarriage of justice."

Assuming arguendo that the trial judge had the authority to grant a new trial in the absence of a contemporaneous objection during trial, an assumption with which I strongly disagree, did the trial judge in this case examine the entire record as required by *Lamb* and its progeny before overturning this jury's decision and granting a new trial?  For whatever reason, the record shows that the trial judge did

---

[4]*Bloxom v. Bloxom*, 512 So.2d 839, 850-51 (La.1987) has been superseded by statute on

not examine the entire record to determine whether the supposed "erroneous" answer to the jury's question caused a "miscarriage of justice." Instead, the trial judge seemed to attempt to shoulder most of the blame. He focused on only one issue, the so-called "erroneous" answer on the effective date of an owner's manual for the steering system, that, admittedly, the owner, Glen Vamvoras, and the operator, Glen's son, Daniel, had never seen or read. It bears repeating that the plaintiff's own expert, Mr. Killingsworth, did not opine that the warning in the manual was lacking. To the contrary, he testified that a manual warning **was not relevant because the owner and the operator had never seen the manual.**

> **Q. Okay. But isn't it logical that, no matter how much you quarrel with the manual, if the person who is supposed to get it didn't get it, it's sort of immaterial to a particular case?**
>
> **A. That I'll agree to.**

(Emphasis added.)

His was the only testimony that defendant was obligated to post a separate warning near the steering wheel and on the helm cylinder. It was that "failure to warn" that Mr. Killingsworth said was in "gross violation of the standard of care" and was "reckless" behavior.

In this case, the trial judge focused only on the trial court's answer to the jury's question about the effective date of plaintiff's exhibit 24, the manual. There was no "careful" review, **or any** review, of the trial record by the trial court. Nor did the majority review all of the evidence in the record to determine whether "the trial court abused its discretion in deciding that the jury verdict was not supportable by 'any fair interpretation of the evidence.'" *Campbell*, 870 2d at 971. The majority quoted only the trial judge's self-blame for giving the jury the "wrong

---

other grounds by *Payne v. Gardner*, 10-2627 (La. 2/18/11), 56 So.3d 229.

answer" about the effective date of the manual.

A full examination of the record amply demonstrates that the "manual issue" was not the basis for the plaintiff's claim. First of all, to repeat, only **one** manual was introduced in evidence, P-24 by **plaintiff**. Hypothetically, if there was an alleged insufficient warning in that manual, it could have had no effect on the jury's ultimate decision, as both the owner and the operator never received or read the manual in question. *See Bloxom*, 512 So.2d 839. Plaintiff's entire case against Teleflex was based on the failure to post a conspicuous warning within easy eyesight of the boat operator, or design an audible warning the operator could hear. The only witness who testified that such a warning should have been posted was plaintiff's expert, Stephen Killingsworth.

In opening and closing arguments, plaintiff's counsel focused on the failure to post a visible warning as recommended by Mr. Killingsworth as the basis for its "failure to warn" products liability claim against Teleflex. No mention whatsoever was made of the adequacy or inadequacy of any "warnings," or lack thereof in the Teleflex Steering System Manual.

In this case, it is clear that someone replaced the original Teleflex manufactured port hose on the hydraulic steering system. It was established by the expert testimony from Mr. Augusto "Kiko" Villalon, the experienced expert hired by the Coast Guard to investigate the accident, that the port hose at the point of connection to the helm cylinder on the hydraulic steering system had been changed, and that a non-Teleflex hose and nut had been used to replace it. That "aftermarket" hose and nut was leaking hydraulic fluid at the connection with the helm cylinder. He opined that someone (whom we now know by his late admission to be Daniel Vamvoras) had attempted to tighten the nut at that

connection with vice grip pliers in a failed attempt to stop the leak of hydraulic fluid. Photographs show the hydraulic fluid leak occurred in the non-Teleflex hose and nut. The component which leaked hydraulic fluid, ultimately leading to a loss of steering, was not a Teleflex product.

Plaintiff's counsel spent a great deal of time trying to challenge Mr. "Kiko" Villalon's credibility by implying that he had done considerable prior work for Teleflex. However, his actual findings were uncontradicted and corroborated by the video of the leaks,[5] as well as by all the pictures in evidence, including plaintiff's exhibits P-2 and P-5, which the jury had specifically asked to see.

Mr. Killingsworth, plaintiff's expert, did not challenge the testimony of how the leak originated and its eventual effect on the boat steering. Nor did the plaintiff allege or argue otherwise. Their point, as testified to by Mr. Killingsworth, was that Teleflex should have displayed a prominent warning that a hydraulic fluid leak of a small amount of fluid could result in a total loss of steering with the possibility of a violet j-turn that could result in property damage, ejection of occupants and serious personal injury or death. Plaintiffs were even allowed to introduce into evidence the exact warnings that Mr. Killingsworth recommended: "WARNING: PARTIAL HYDRAULIC FLUID LOSS can cause total loss of steering, a sudden spin, ejection of occupants, and in injury or death!!!!" Teleflex did install new warnings after the accident, which the trial judge also admitted into evidence in a questionable ruling as the new warnings were clearly "subsequent remedial measures." Those warnings are depicted on P-22 and P-23 and were shown to the jury.

---

[5] Teleflex 3.3 – DVD Villalon Video.

Plaintiff's counsel did an exceptional job of attempting to prove the case, but the jury heard all of Mr. Killingworth's testimony and obviously rejected his theory that failure to post a visible warning by Teleflex or design an audible warning, was a cause of the accident. Again, credibility calls and the duty to weigh the evidence, find the facts and assign fault is within the unique province of the jury.

This jury also heard the testimony of Eric Fetchko, the engineer at Teleflex who had designed and patented the hydraulic steering system, who testified at length at the trial. He was clear that the system had been tested and retested and was much safer than the prior cable system used to steer recreational vessels of this type. This was "power steering" for boats. The system had been in use fifteen years with no prior complaints of a total failure such as this. Mr. Fetchko was adamant that any operator of this vessel would immediately notice and feel a tactile change in the steering of the vessel should there be "air in the system" due to a hydraulic fluid leak. Such a leak would make the steering feel "spongy" or "mushy." The operator may also hear a distinct "clicking sound" as he turned the steering wheel, and more rotations of the wheel would be required to execute a turn. Those signs, that could easily be seen, heard, and felt, would be sufficient to warn any prudent boat operator that something was wrong with the steering such that it should be brought to a qualified mechanic to check it out. If such signs were present, as they clearly were in this case, under no circumstances should an operator run the vessel on plane at high speed.

Mr. Walter Laird, Teleflex's expert, went into great detail in describing that there was supposed to be an "O-ring" seal that would be present in a Teleflex hose that would prevent leaks in the hydraulic steering system. He concluded that either

the O-ring in this aftermarket hose was leaking or absent, and that was the cause of the hydraulic fluid leak and the eventual cause of the steering failure which caused this tragedy.

Mr. Laird even set up a demonstration for the jury to see how the steering would be affected if there was such a leak. He reiterated that if the fluid leaked, air would enter the system and would cause pronounced "clicking." The vessel operator would feel a "bumpy" or "mushy" feeling and, as time went on, it would take more turns of the steering wheel to turn the boat. This would happen gradually and any boat operator would immediately be able to feel the difference in steering. Contrary to what would happen in a cable system where, if a steering cable broke, there would be no warning before a complete loss of steering, the Teleflex system would not suddenly fail without warning. The tactile sensation, "clicking" and "spongy feeling," "bumpiness," or "mushy feeling" could immediately be felt and would gradually get worse over time if the system continued to leak hydraulic fluid.

Testimony and records from both marinas that performed general maintenance on this boat was that no one had done work on the hydraulic steering system, and both were dismissed from this case after extensive attempts during pre-trial discovery produced no records of work on the hydraulic steering system. Someone obviously changed that hose and the nut at that leaking port hose connection.

Mr. Glen Vamvoras testified that a few months before this accident, he and a friend, Mr. Ronnie Gibbs, were fishing and Mr. Gibbs told him the steering "felt different." They discussed adding hydraulic fluid to the steering system. Mr. Vamvoras claimed that Mr. Gibbs called another person, Mr. "Buck" Fellows, who

told them where to add hydraulic fluid. Mr. Vamvoras went to Wal-Mart, purchased the fluid, and added it himself without consulting a hydraulic steering system mechanic located near his home. There is conflicting evidence that he may have added even more hydraulic fluid just two months before this tragedy. The jury could have easily concluded that Glen Vamvoras knew or should have known that there was a leak in the hydraulic steering system and problems with the steering. The pictures in evidence and the video tell the tale!

The LDWF agent, Sgt. Liles, and "Kiko" Villalon confirmed that there was evidence of poor maintenance and a visible leak at the non-Teleflex hose connection, and a video shown to the jury depicted the leak.

Mr. Glen Vamvoras certainly knew that there were qualified boat mechanics located just a short distance from his home as he had used two of them for general maintenance. Still, he decided that in order to correct a steering problem with his boat, he would use "self-help" and added the hydraulic fluid he purchased from Wal-Mart. He denied replacing the hose. Obviously, the jury could have made a decision based on all the evidence and determined that Mr. Vamvoras or his friend, or someone had improperly replaced the Teleflex hose with an after-market hose. Mr. Vamvoras admittedly added hydraulic fluid to the steering system without proper training. He certainly did not "stop the leak" in the hydraulic steering system, as the photos and video in evidence so clearly show.

On the very day of this tragedy, Mr. Glen Vamvoras told Captain Buatt, one of the investigators for LDWF, that he noticed something was wrong with the steering and that he heard a "clicking noise." He initially denied knowing of a hydraulic fluid leak. He said that no one else worked on the boat other than the two marinas and he and Daniel.

Daniel Vamvoras at first denied to the LDWF investigators that he had tried to fix the hydraulic steering system leak by tightening a nut at the port hose connection with vice grip pliers on the day of the accident. He also denied telling his friend, Blaine Teter, that he noticed steering problems with the boat on the morning of the accident as he drove the boat to and from the fuel dock near his house, and as he was pulling someone behind the boat on an inner tube earlier that day.

The pictures introduced in evidence clearly showed that the vise grips were in the boat and had been used to tighten the nut on the non-Teleflex hose to try and stop a hydraulic fluid leak. The photos and a video of the leak introduced in evidence told the story. Though both Daniel and his father, Glen, at first outright denied to the LDWF agents that either of them knew of a steering problem or a fluid leak, Daniel eventually admitted that he was aware of the leak and Glen was questioned about a conflicting statement he made to the LDWF investigator, Captain Buatt, shortly after the accident about his knowledge of prior steering problems.

LDWF agent Sgt. Liles testified at trial that Daniel eventually admitted that he had, in fact, attempted to "fix the leak by tightening the nut" on the day of the accident. At trial, Daniel continued to deny that he noticed anything wrong with the steering, but did admit he heard a "clicking sound." He said his father, Glen Vamvoras, had used the boat only days prior.

Glen Vamvoras testified that as he was putting up political signs for his D.A.'s campaign just three days prior to the accident, he noticed an unusual "clicking" sound in the steering, but did nothing to have it checked before allowing Daniel to take on six passengers three days later to party on "Contraband Days."

He claimed he did not notice what the photos the jury saw and what the video introduced at trial clearly demonstrated was an obvious leak, and he continued to deny any problems with the steering.

Again, expert testimony from Mr. Fetchko and Mr. Laird at trial established that the "clicking sound" was caused by too much air in the system which indicated a loss of hydraulic fluid which would cause very noticeable, tangible problems with the steering. The boat operator would feel a "mushiness" or "spongy feeling" and would have to turn the wheel more to control the steering. The operator would hear "clicking." This "tactile sensation" and "clicking" was the "warning" that something was wrong with the steering and those signs would get more pronounced as more fluid was lost.

The jury was faced with a credibility determination and could easily have rejected the testimony of Daniel and his father as to their knowledge of steering problems and attempts to "fix" those problems before this accident and concluded that Teleflex was not liable for "failure to post visible warnings."

Indeed, the first question the jury asked during deliberations was:

> You had two questions: Are we making any judgments on Vamvoras or Bowtie?

JURY FOREMAN:

> Right.

THE COURT:

> This answer is, no. Okay?
>
> And then you second question: Are – I think it reads, "Or are they released from any responsibility."

JURY FOREMAN:

> Yeah. We didn't know if they were released from just the

courtroom, from questioning or just released from this.

THE COURT

I made a decision that they're relieved from any responsibility. Okay? So you're just to make a determination insofar as - - I lost my head, Teleflex - - Teleflex is concerned.

Okay, you can go back. Thanks you, folks.

(Whereupon, the jury exits the courtroom to deliberate.)

This writer is not suggesting that Glen Vamvoras intentionally lied or tried to deceive the court or jury. However, it is undisputed that at the time of these events, Mr. Vamvoras was distracted as he was engaged in a hotly contested D.A.'s race. Faced with a lawsuit against him and his son after this terrible tragedy, he and his son, like most humans, may have had a tendency to minimize their involvement or rationalize their decisions. The jury had full opportunity to see and hear Mr. Vamvoras and Daniel, as well as all the other witnesses. They also saw all the pictures and the video.

Daniel explained his decision to load his friends in a boat when the steering was "clicking" and when he knew there was a hydraulic fluid leak. It was Contraband Days, a big party on the river. There were fourteen of his friends there and they needed two boats. Though both Daniel and his father testified that had they realized a small loss of hydraulic fluid could eventually lead to a complete loss of steering, Glen would not have permitted Daniel to take the boat out and Daniel would not have done so.

The trial judge and majority focused on the lack of "ease of association" between loss of hydraulic fluid and **complete** loss of steering. The plaintiff's case was based solely on the claim that since neither realized the risk, a "visible warning" could have alerted them.

Such a conclusion assumes that the jury found their testimony that they did not notice problems with the steering and an obvious leak of hydraulic fluid credible. Most importantly, though both Daniel and his father were not experienced **boat mechanics**, they were experienced **boat operators** of recreational boats in general and this boat in particular. Each was acutely aware that a loss of steering while a vessel was underway at high speed could cause disastrous consequences.

Good judgment and common sense dictates that if the boat is having steering problems, you don't load seven people in the boat and operate the boat at high speed on a plane. Both Daniel and his father had operated this particular boat for over six years (purchased in 1999, accident in 2005). Both were experienced operators of recreational vessels and had enough experience with this particular boat to know, and indeed they admitted, that if there were steering problems, it was unsafe to operate the vessel at high speed on plane. Sgt. Liles, the LDWF agent, confirmed at trial that even though he didn't know that a loss of a small amount of hydraulic fluid could result in a complete loss of steering control, he testified that if he "felt" or "experienced" a problem with the steering, he would take the boat to the shop. The first jury verdict in favor of Teleflex was and is fully supported by the law and evidence and should be reinstated.

## CONCLUSION

To paraphrase Shakespeare, A Miscarriage of Justice "should be made of sterner stuff."[6] The only "miscarriage of justice" here was the trial judge's failure to recognize that there was no objection to his answer to the jury's question as to

the effective date of the only manual in evidence. No contemporaneous objection, no new trial!

After carefully reviewing the entire record in this case, it is clear that the trial judge abused his discretion in granting a new trial. He did not apply the contemporaneous objection rule. He did not review **all** of the evidence and make a fact based determination that the jury verdict was not supportable by "any fair interpretation of the evidence" pursuant to the mandates of our jurisprudence. Likewise, the majority did not apply the contemporaneous objection rule and focused on the trial judge's self-admitted "error" in answering the jury's question about the effective date of a hydraulic steering owner's manual that neither the owner nor operator had seen and that plaintiff's expert had opined was not relevant. The majority did not articulate, based on a review of all of the evidence in the record, how it determined the jury's verdict was not supportable by "any fair interpretation of the evidence" before affirming the trial court's decision to vacate this jury's verdict.

Most importantly, the trial judge overturned a jury's verdict whose job it was to evaluate credibility and assign fault. After comprehensive study of the applicable law and careful review of all the evidence, I would reverse the decision of the trial court to grant a new trial and render judgment reinstating the verdict of the first jury and reinstating the original judgment of the trial court dated September 30, 2014 dismissing plaintiff, Ron Warren's, claims, with prejudice, at his cost.

---

[6]Julius Caesar "Ambition should be made of sterner stuff." (Act 3, Scene 2).